Charles E. WALLACE and Steve Hartman, both individually, and City of Lafayette, Indiana, Appellants–Defendants,

v.

ESTATE OF Christopher W. DAVIES, by its Administratrix Heide DAVIES, Heide Davies, Kyle Davies, a minor, by his mother, Heide Davies, Tiffany Davies, a minor, by her mother, Heide Davies, and Christopher T. Davies, a minor, by his mother, Heide Davies, Appellees–Plaintiffs.

No. 79A04–9603–CV–116.

Court of Appeals of Indiana.

Feb. 27, 1997.

---

William W. Kurnik, Michelle J. Hirsch, Kurnik, Cipolla and Barasha, Ltd., Arlington Heights, IL, James S. Stephenson, Stephenson, Daly, Morow & Kurnik, Indianapolis, for appellants-defendants.

Charles R. Vaughan, Robert W. Johnson, Vaughan and Vaughan, Lafayette, Hamid R. Kashani, Indianapolis, for appellees-plaintiffs.

**OPINION**

DARDEN, Judge.

### STATEMENT OF THE CASE

Steve Hartman and the City of Lafayette appeal the jury verdict in favor of the estate, the widow, and the children of Christopher Davies on their claims that the city and Hartman committed constitutional and common law torts. We affirm.

### FACTS [1]

Late in the morning of March 2, 1993, Christopher Davies called Trinity House, asked to speak with his counselor, and said he was going to kill himself. His counselor, Joel Milligan, was not on the premises. Trinity House contacted Milligan and the Lafayette Police Department. Trinity House told the police that Davies had expressed his intent to commit suicide and wanted to speak with Milligan. The dispatcher directed Officer Charles Wallace and Officer Royel Ping to Davies' apartment address, indicating that Milligan, was also on the way to see Davies—who had "threatened suicide." (R. 841). Lieutenant Steven Hartman heard the dispatcher's mention of suicide, saw Wallace drive past him and, as shift supervisor, followed to participate in the response to a high risk call. Because he had not heard the entire initial dispatch message, Hartman asked the dispatcher for the specific address, which was provided as well as the information that Davies had called Trinity House from a public phone booth, probably at the Village Pantry, and that Davis had reported having drunk a whole bottle of whiskey, having a gun and a bullet, and intending to commit suicide within the hour.

Hartman and Wallace arrived at the area of the complex near Davies' apartment at about the same time. Hartman knew a counselor was on the way. He radioed to Ping,

---

1. We remind counsel of the appropriate method for presenting a statement of facts. Appellants' summary of each witness' trial testimony is not a statement of the facts within the meaning of Ind.Appellate Rule 8.3(A)(5). *Levi v. State*, 627 N.E.2d 1345, 1347 (Ind.Ct.App.1994). Appellees' format for a statement of the facts also fails to provide the "narrative statement of the facts," *id.*, contemplated by the rule.

We further bring to appellant's attention the requirement of Ind.Appellate Rule 7.2(A)(3) that appropriate marginal notations be provided on each page of the transcript of evidence, including the name of each witness and whether the examination is direct, cross, or redirect.

who had not arrived, telling him to "keep the counselor[ ] back till we check inside." (R. 842). Hartman and Wallace proceeded to the apartment building.

The apartment buildings had three levels. An open area provided access to a stairway to the upper two levels and a stairway to a lower level. The lower level apartments had windows at waist level on the inside but ground level on the outside. Davies' address was street number 3071, apartment 813. At the entry area to number 3069, Hartman and Wallace observed that the apartment numbers ascended from the lower level up, leading them to believe that apartment 813 would be an upper apartment. Therefore, Hartman and Wallace walked close to the building toward the entry area of number 3071. When they looked at the apartment numbers there, they realized that apartment 813 was a lower apartment; they had just walked past its ground level windows.

Wallace stood in the open area, where the stairway descended. Hartman held his gun behind his back and eased down the stairway, keeping against the lefthand wall. At the bottom of the stairs, the lefthand wall contained the doorway to apartment 813. Hartman stood at the bottom of the stairs, to the side of the door. Hearing nothing from inside, he "slowly twisted the doorknob." (R. 1314). Hartman removed his hand from the doorknob, and as he started to turn around to signal to Wallace, the door opened. The barrel of a shotgun appeared, and Davies walked straight out with the gun in an angled or port arms position. Davies looked at Hartman and started turning, lowering the angle of the shotgun. Hartman fired one shot and fatally wounded Davies.

Davies' widow, Heide Davies,[2] brought an action seeking damages arising out of the fatal shooting, naming as defendants the City of Lafayette, and Hartman and Wallace. Damages were sought under 42 U.S.C. § 1983 pursuant to a claim that they used "excessive, unreasonable, and unnecessary deadly force," (R. 44), and also under state common law theories of battery and negligence. A motion for summary judgment by the defendants was denied by the trial court, and the matter proceeded to trial.

The trial court instructed the jury on five claims presented by the plaintiff: (1) the defendants violated the Fourth Amendment by using unreasonable force; (2) the defendants violated the Fourteenth Amendment by knowingly, or at least recklessly, cutting off the private avenue of relief (the counselor) available and by failing to provide a meaningful alternative; (3) the city violated the plaintiff's constitutional rights because Hartman was acting pursuant to an official policy or custom of the city or because the city had failed to adequately train its police officers in dealing with suicide intervention; (4) the defendants violated state law in using more force than was reasonably necessary; and (5) the defendants violated state law by conducting themselves negligently in responding to the suicide threat. The jury returned a verdict in favor of the plaintiff and against Hartman and the city. For civil rights violation, the jury awarded damages of $1,400,000; for state claim, $1,000,000. The parties agreed that the damages awarded under the state law claim were included in and duplicative of the damages under the civil rights claim. Accordingly, the court entered judgment against Hartman and the city in the amount of $1,400,000.

## DECISION

At the outset, we emphasize what the defendants are appealing to this court. The defendants did not seek to appeal the trial court's denial of their motion for summary judgment, wherein they had asserted that as a matter of law they could not be found liable. Likewise, defendants do not now argue on appeal that the denial of their summary judgment motion constituted trial court

---

2. So says appellants' statement of the case. Appellees provide no statement of the case whatsoever, either ignoring the mandate of Ind.Appellate Rule 8.3(B) or expressing no "dissatisf[action] with the statement of the appellant." *Id.* However, we note that the complaint identifies her status as plaintiff to be fivefold: as administrator of Davies' estate; on her own behalf; on behalf of minor son Kyle; on behalf of minor daughter Tiffany; and on behalf of minor son Christopher. Consistent with this background, we will hereafter refer to Heide Davies as the plaintiff.

error. The defendants raise no claims of instructional error. Nor do they claim that the trial court erroneously admitted evidence. Rather, the defendants raise a series of challenges to the jury's verdict, claiming either that as a matter of law or because there was insufficient evidence they cannot be held liable.[3]

■■■■ We recently restated the standard for reviewing a claim of insufficient evidence or that a judgment is contrary to law.

In addressing a claim of insufficiency of the evidence, our standard of review is well-settled. We will neither reweigh the evidence nor judge the credibility of witnesses. Rather, we consider only the evidence most favorable to the verdict, and if substantial evidence of probative value supports the verdict it will not be set aside. Likewise, in addressing a claim that a judgment is contrary to law, we neither reweigh evidence nor judge witness credibility and will reverse the judgment only if the uncontradicted evidence leads to a conclusion opposite that reached by the trial court.

*Schultheis v. Franke,* 658 N.E.2d 932, 938–39 (Ind.Ct.App.1995) (citations omitted).

### § 1983

■■■■ An action under § 1983 contains two essential elements: "the conduct complained of was committed by a person acting under color of state law," and "this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981). The plaintiff claimed

Hartman violated Davies' Fourth Amendment right to be free from unreasonable seizure when he shot Davies. The court instructed the jury, consistent with *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), that an "officer's use of deadly force is justified under the Constitution" if he "reasonably believes that such force is necessary to prevent serious bodily injury" to himself or a third person. (R. 690).

Officer Wallace testified that Davies came out of his door with the gun in "a port arms position." (R. 954). The transcript of the first interview with Wallace at police headquarters immediately after the shooting, which the jury had before it as evidence, also contained a statement by Wallace that Davies came out the door with the gun in a "port arms position." (R. 924). In a "port arms" position, the gun "is held diagonally in front of the body so that the barrel is at the left shoulder." *Webster's Third New Int'l Dictionary* 1768 (G. & C. Merriam Co. ed.1976). Further, all of Wallace's statements indicated that Davies exited straightforward from his doorway and then turned toward Hartman, lowering the angle of the gun somewhat. Wallace also testified that when Hartman fired, Davies' position was "[j]ust short of having the shotgun leveled at us and aimed." (R. 935). However, as noted, we consider only the evidence most favorable to the verdict and do not judge the credibility of witnesses. *Schultheis.* The jury could have chosen to believe Wallace's statements about the port arms position and, therefore, found that having simply lowered the gun somewhat from his shoulder but not having swung it away from his body to point

---

**3.** Although Hartman and the city (the defendants) raise the following eight issues, we do not reach all of them.

    1. Whether as a matter of law Hartman's use of deadly force neither constituted a § 1983 deprivation of Davies' Fourth Amendment rights nor a battery under state law.

    2. Whether the jury was allowed to impermissibly consider Hartman's pre-shooting conduct in determining whether he deprived Davies of his Fourth Amendment rights.

    3. Whether Hartman is entitled to qualified immunity because his use of force did not violate a clearly established constitutional right of Davies.

**4.** Whether insufficient evidence supported a judgment finding the city liable based upon its failure to train police officers.

    5. Whether as a matter of law Hartman did not deprive Davies of his Fourteenth Amendment right to not have police interfere with or cut off a private avenue of rescue without providing a meaningful alternative.

    6. Whether as a matter of law Hartman is entitled to law enforcement immunity under the Tort Claims Act as to the state law claims.

    7. Whether as a matter of law Davies' actions constituted contributory negligence.

    8. Whether the total state law liability of the defendants is limited to $300,000 by statute.

perpendicularly toward Hartman, Davies did not pose a threat to Hartman. Accordingly, the jury could have found that under "the totality of the facts and circumstances known to" Hartman, which it was instructed to consider, (R. 690), the force Hartman used was unreasonable.[4]

■■■ In addition, the court instructed the jury that it could consider the opinion of an expert who answered a question in which certain facts were assumed to be true. (R. 676). The plaintiff's expert, who retired as deputy chief after twenty years with the Los Angeles Police Department, was asked whether it was reasonable in responding to a report of an individual who had drunk a bottle of liquor, threatened suicide and wanted to talk to his counselor to have gone down the stairway and twisted the doorknob. The expert answered that "it was just ridiculous" and "was unreasonable for several reasons." (R. 1167). He said the officer should not have gone down the stairs "into a hole," *id;* rather both officers should have remained in a position of cover at the corners of the ground level entry area. He added that with respect to twisting the doorknob,

> more importantly, anything—in my opinion, anything you do to this door has the potential of alerting someone inside and when you're dealing with a despondent person, you don't want to agitate them. They're very unpredictable.

(R. 1169). To determine whether police officers have used excessive force in effecting a seizure, courts apply a Fourth Amendment objective reasonableness standard. *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104

L.Ed.2d 443 (1989). The jury was instructed that the "reasonableness standard for use of force by the police is objective." (R. 690). Further, the jury was instructed that the purpose of an expert's testimony was "to assist you." (R. 676). The jury's credence in the expert's testimony that upon those facts a police officer would have been acting unreasonably could have properly assisted them in arriving at a conclusion that Hartman's action was unreasonable.[5] We do not find uncontradicted evidence leading to an opposite conclusion, and sufficient evidence supports a verdict finding Hartman violated Davies' Fourth Amendment right to be free from unreasonable seizure. *See Schultheis.*

### Qualified Immunity

■ The defendants also claim that Hartman is entitled to qualified immunity under § 1983 because his conduct in shooting Davies "was not such that reasonably competent police officers would have concluded was unreasonable ... under the status of the case law at the relevant time." Defendants' Brief at 26.

■■■ In 1985, the Supreme Court held that only if an officer reasonably believes deadly force is necessary to prevent serious bodily injury to himself or another will such force not violate the Fourth Amendment. *Garner.* For an official action to be unprotected by qualified immunity does not require that the questions have been been held unlawful, but rather "that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523

---

4. We hereby grant the defendants' motion to strike Part II(2)(a) of appellees' brief. The plaintiffs' argument that the jury verdict can be sustained based on the evidence that Hartman shot Davies on sight after Davies had just come to the door and that Hartman had opened the door to Davies' apartment is not supported by the evidence.

5. The defendants argue that jury consideration of pre-seizure conduct in assessing the constitutionality of Hartman's use of force is improper. However, as the plaintiff responds, defendants tendered no proposed instructions toward the end of limiting the range of facts available for the jury's determination of whether his action violated Davies' Fourth Amendment rights. In reply,

the defendants argue that their having "previously raised the issue[] in a motion for summary judgment ... preserves the issue for review." Defendants' Reply at 39. However, their authority in that regard addresses whether a failure to *object* to a tendered instruction results in a waiver of the right to appeal *the denial of a summary judgment motion. See Lutheran Hospital of Fort Wayne, Inc. v. Doe,* 639 N.E.2d 687, 689 n. 5 (Ind.Ct.App.1994). Implicit in the defendants' argument is the contention that the instructions given by the court on this issue were erroneous. Therefore, defendants' issue concerning pre-seizure conduct is waived for failure to either have tendered instructions in this regard or to have objected to the instructions given.

(1987). Thus, essentially, the inquiry is whether the conduct was clearly unconstitutional under the state of the law in 1993, when Davies was shot.

As already discussed in our review of the facts about Davies' position as he exited his apartment, the jury could have found that Davies did not present a threat of bodily injury to Hartman. This is the standard of *Garner* given the jury. The jury was also instructed that "the firing of a weapon must never become an automatic response to the law enforcement officer when attempting to capture a fleeing felon." (R. 690). Davies was not a fleeing felon.[6] Davies' Fourth Amendment right—to be subject to a police officer's use of deadly force only to prevent serious bodily injury to the officer or a third person—was "sufficiently clear so that a reasonable official would understand that what he is doing violates that right." *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039. We do not find uncontradicted evidence leading to a conclusion opposite that of the trial court. *See Schultheis.* Therefore, the trial court did not err as a matter of law in finding Hartman not to be entitled to qualified immunity.[7]

### *City Liability*

█ The defendants claim "there was insufficient evidence upon which to base a judgment against the city under 42 U.S.C. § 1983 based upon its failure to have a written policy for handling suicidal individuals and failing to train officers in this area." Defendants' Brief at 30.

█ Under § 1983, a municipality may be held liable for the unconstitutional actions of its officers committed pursuant to an official policy or custom. *Monell v. New York City Dept. of Social Srvcs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). As the plaintiff observes, "[M]unicipal liability may be imposed for a single decision by municipal policymakers." *Pembaur v. Cin-*

cinnati, 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986). The defendants heatedly respond that the "key word" in this quotation is "that liability can be imposed for a single act taken by a 'policy-maker,'" and Hartman was not "a policy-maker" for the city. Defendants' Reply at 35.

We look to the court's instructions to the jury for the basis of the city's liability. The court instructed the jury that the city could be found liable "if the actions or inactions of" Hartman "violated the Constitution, *and* . . . the City failed to adequately train its officers and such failure amounts to deliberate indifference to the rights of persons, including Christopher W. Davies, with whom the officers come into contact." (R. 696). The court explained that "deliberate indifference" existed "[w]hen the need to train officers in a particular area is so obvious that" failing to so train "would amount to disregarding a substantial risk of serious harm." (R. 697). Accordingly, the jury was permitted to find the city liable not for Hartman's decision about how to proceed but for the city's failure to train its officers in the area of responding to an individual threatening suicide.

After examining the development of *Monell* in *Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985); *Pembaur; St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); and *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the Second Circuit Court of Appeals in *Walker v. City of New York,* 974 F.2d 293, 297 (2nd Cir.1992), *cert. denied* 507 U.S. 961, 113 S.Ct. 1387, 122 L.Ed.2d 762 and 507 U.S. 972, 113 S.Ct. 1412, 122 L.Ed.2d 784 (1993), held that on a § 1983 claim of failure to adequately train, three requirements must be met before a municipality's failure to train constitutes deliberate indifference to the constitutional rights of its citizens. First, the plaintiff must show that a policymaker knows that the employees will confront a given situation. *Id.* Second, the plaintiff must show that the situ-

---

6. The jury was also instructed that "neither suicide nor attempted suicide [is] against the law in Indiana." (R. 700).

7. Because we do not find that a verdict holding Hartman liable for violating Davies' Fourth

Amendment right would be erroneous, we do not reach the defendants' claim that holding Hartman liable for violating Davies' Fourteenth Amendment right to life is contrary to law.

ation either presents the employee with a difficult choice of the sort that training will make less difficult or that there is a history of employees mishandling the situation. *Id.* Finally, the plaintiff must show that the wrong choice by the employee will frequently cause the deprivation of a citizen's constitutional rights. *Id.* at 298.

To show the city knew officers would confront individuals threatening suicide, Hartman testified that in eighteen years he alone had been dispatched to "fifty to a hundred" actual or threatened suicides. (R. 978). The plaintiff's expert indicated the city's police department consisted of "eighty to a hundred police officers." (R. 1181). He further opined that suicide calls are "something that you ... can expect officers will regularly encounter," and might constitute "as much as six to eight percent of" calls to a police department. *Id.* He correlated the need for a "written policy on how to handle suicides" with the volume of that kind of calls to the police department. *Id.* Sufficient evidence supports a jury conclusion that the city knew officers would confront this situation.

We consider whether plaintiffs showed that the situation of a threatened suicide presents an officer "with a difficult choice of the sort that training will make less difficult." *Walker.* According to the plaintiff's expert, the "textbook" rule is to "never leave good cover for no cover." (R. 1168). Further, "how police departments should operate with ... a suicidal person 'and the type of call they had" was the CCCT method, described as follows:

> The first "c" ... to coordinate the police operation. The second "c" ... containing the scene, containing the subject you're dealing with. The third "c" ... communication and that deals with communicating with the subject. And then the last "t" is for time. And it's important to try to spread that time out as much as possible. . . .

(R. 1173). Finally, a policy can train officers to avoid mistakes, "because it's the mistakes that end up creating the situations that" they may have to "shoot [their] way out of." (R.

1195). Police training would particularly emphasize communication:

> You want to first of all identify that you're police, it's extremely important that they know there's someone of authority there, you want them to know that you're there to help them because in this case it's like a welfare check. There is no crime that has been committed, there's a person threatening suicide and wanting help so it's important to make sure that you let them know you're here to help. And ... in this particular situation [ ] to let him know, Mr. Davies, that his psychologist is there or will be and if he then does certain things he can get to talk to him. So it's essential—you want to begin to create the dialogue, create some sort of communication, you want to do it in a way that defuses the situation or reduces the tension. Emotionally disturbed persons are real unpredictable. Lots of things can set them off so you have to try lots of techniques but the one you try the first is in a calm tone of voice you want to begin communicating with them. It's very important to have open-ended [ ] questions that forces them to start thinking rather than just answer yes or no. . .

(R. 1178). The jury could have concluded that the failure to have a policy on suicide intervention would likely result in officers making wrong choices.

Finally, we look at the third factor: whether the wrong choice will frequently cause the deprivation of a citizen's constitutional rights. *Walker.* The jury found that a wrong choice was made here, in the instance of an individual threatening suicide and having a deadly weapon; Davies was deprived of his Fourth Amendment rights. Further, Hartman testified that the police department had no compilation of its suicide calls, and a search of all individual police calls would have to be made to determine which concerned suicide and to locate the corresponding reports. This testimony suggests that there might have been other instances of a wrong choice having been made when responding to a suicide call. The jury could have concluded that the city's failure to have an official policy for training

officers on the subject of suicide intervention would cause the deprivation of citizens' constitutional rights.

We do not reach the defendants' claims of error with respect to liability for state law torts because inasmuch as we find no error in the jury's verdict for the plaintiff on a § 1983 claim against Hartman and the city, an error on the state claims would not affect the award of damages to the plaintiff.

The judgment is affirmed.

RILEY and RUCKER, JJ., concur.