James WALKER, Plaintiff–Appellant,

v.

The CITY OF NEW YORK,
Defendant–Appellee.

No. 1783, Docket 92–7365.

United States Court of Appeals,
Second Circuit.

Argued June 26, 1992.

Decided Sept. 4, 1992.

Douglas S. Liebhafsky, New York City (Claire D. Chappell, Wachtell, Lipton, Ro-sen & Katz, of counsel), for plaintiff-appellant.

A. Orli Spanier, New York City (O. Peter Sherwood, Corp. Counsel, Ellen B. Fishman, David Lock, New York City, of counsel), for defendant-appellee.

Before: NEWMAN, PRATT, and WALKER, Circuit Judges.

WALKER, Circuit Judge:

Plaintiff James Walker spent nineteen years in prison for a crime that it now appears he did not commit. In 1971 police officers and prosecutors covered up exculpatory evidence and committed perjury in order to insure Walker's conviction despite their knowledge of Walker's probable innocence. After unearthing facts critically undermining the state's case against him, Walker won his release from prison in 1990. Walker then filed suit under 42 U.S.C. § 1983 against the City of New York in the United States District Court for the Southern District of New York, seeking eleven million dollars. The district court dismissed the suit for failing to state a claim upon which relief can be granted.

The question presented to us on appeal is whether a plaintiff who alleges that he has been falsely imprisoned for nineteen years has a claim for relief under § 1983 against the city that hired but allegedly failed adequately to train and supervise the police officers and prosecutors who conspired against him. When stated this way, the question seems to admit of only one answer. However, beneath the obvious equities of this case lie complex and difficult questions of federal law.

## I

On June 1, 1970, William Powell and at least one accomplice robbed an armored truck. Powell murdered the truck's driver, Edward Kargman, while an accomplice struck a guard, Jose Ruiz, with a sawed-off shotgun, knocking him unconscious. William Powell pled guilty to felony murder in October 1971.

The police were unable to identify, much less find, Powell's accomplice until several

months after the incident, when John Snider, a drug addict with a substantial criminal record, identified James Walker as the man who assaulted Jose Ruiz. Snider also told the police that Melvin Givens, a friend of Walker, had participated in the crime. Snider was previously acquainted with Givens and knew Walker to be Givens' friend.

On April 23, 1971 Detective Robert Powell ("Detective Powell"), the police officer in charge of the investigation, arrested Walker. After the arrest, Walker took part in a police lineup. At the lineup, Jose Ruiz failed to pick out Walker and instead identified another man (apparently a police officer) as his assailant. The investigation suffered a second setback when Detective Powell and Kings County Assistant District Attorney ("ADA") J. Paul Zsuffa, the lead prosecutor on the case, learned that Melvin Givins had been in prison on June 1, 1970, the date of the heist. Thus, contrary to Snider's statement, Givins could not possibly have participated in the crime.

Undeterred, ADA Zsuffa and Detective Powell decided to continue efforts to prosecute Walker. In June 1971, Snider testified before a grand jury, implicated Walker, and made no mention of Givins. The grand jury indicted Walker.

Although the prosecution possessed documents revealing both Snider's prior false statements and Ruiz's failure to identify Walker, no such documents nor any record of either incident was ever turned over to the defense. Instead, in a pre-trial hearing pursuant to *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), ADA Zsuffa appeared as a witness and denied that the April 23 lineup had taken place. At the same hearing, Detective Powell claimed that he could not recall the lineup. At trial, Snider testified against Walker without mentioning Givins, and Detective Powell testified to the consistency between Snider's statements after the incident and at trial, despite the glaring discrepancy between them.

On October 19, 1971 a jury convicted Walker of murder. In April 1972, the court sentenced Walker to a term of twenty years to life imprisonment. Years later, Walker learned of the exculpatory evidence

concealed in this case. On January 2, 1990 Walker moved in state court for an order vacating his conviction. With the consent of the Kings County District Attorney's office, the court entered an order dismissing the indictment, with prejudice, and vacating the conviction.

After winning his release, Walker sued New York City ("the City") under 42 U.S.C. § 1983, alleging that the City had failed adequately to train and supervise the police and the district attorney's office. Specifically, Walker asserted that the City should have trained police officers and ADAs not to commit or suborn perjury and not to suppress exculpatory evidence. Walker asserted that the City's failure to train constituted deliberate indifference to his constitutional rights and proximately caused his wrongful imprisonment.

On the City's motion, the district court dismissed Walker's complaint. The district court reasoned that failure to train and supervise City employees can only constitute deliberate indifference by the City where it should be obvious to City policymakers that training and supervision is required. The district court concluded that there was no obvious need to train prosecutors and police officers not to commit or suborn perjury, since that should be clear to all without training. Similarly, the district court found that the prosecutor's duty to turn over exculpatory material to the defense was sufficiently obvious as not to require training. Finally, the district court concluded that whether or not it was obvious that police officers should turn over exculpatory evidence, any failure to train in this regard did not proximately cause Walker's injuries, since the police did turn over the exculpatory evidence to the prosecution and only the prosecutor had a duty to turn the evidence over to the defense. Accordingly, the district court dismissed Walker's complaint. This appeal followed.

## II

This appeal requires us to address a basic question of section 1983 litigation: when are municipalities liable for the unconstitutional acts of municipal employees? Until 1978, the answer to that question was

simple—never. *See Monroe v. Pape*, 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961). In *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court overruled *Monroe* and declared that Congress had not intended to exempt municipalities from liability in all cases. The *Monell* court also concluded that Congress had not intended to expose municipalities to *respondeat superior* liability for all misdeeds by municipal employees. Rather, it is only when the municipality itself commits the misdeed, that is, "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037.

*Monell* raised several elusive questions. What is a government policy or custom? Who is a policymaker? Can a single incident constitute an unlawful policy? In developing answers to these questions, the Supreme Court has been mindful of maintaining a delicate balance between insuring that municipalities are liable for their own misdeeds and avoiding *respondeat superior* liability. *See St. Louis v. Praprotnik*, 485 U.S. 112, 131, 108 S.Ct. 915, 928, 99 L.Ed.2d 107 (1988) (opinion of O'Connor, J.); *Pembaur v. Cincinnati*, 475 U.S. 469, 477, 106 S.Ct. 1292, 1297, 89 L.Ed.2d 452 (1986); *Oklahoma City v. Tuttle*, 471 U.S. 808, 830, 105 S.Ct. 2427, 2439, 85 L.Ed.2d 791 (1985) (opinion of Brennan, J.).

In *Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), the Court considered whether evidence of a single incident of use of excessive force by the police could, without more, establish a municipal policy of failing to properly train and supervise police officers. The Court concluded that to allow evidence of a single incident to establish inadequate training, without any proof relating to the nature of the training itself, would "unduly threaten [a municipality's] immunity from *respondeat superior* liability." *Id.* at 830, 105 S.Ct. at 2440 (opinion of Brennan, J.). Instead, to establish inadequate training, plaintiffs must put forward some evidence that the City itself has acted or consciously not acted. *Id.* at 832, 105 S.Ct. at 2440 (opinion of Brennan, J.).

In *Pembaur v. Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), the Court clarified that *Tuttle* should not be taken to mean that a single act could never be the basis of municipal liability. So long as the single challenged act was the decision of a municipal policymaker, the municipality could be held liable. *Id.* at 480, 106 S.Ct. at 1298. The *Pembaur* court fractured, however, on the precise definition of a policymaker for § 1983 purposes. A plurality of the Court suggested that a policymaker was one who, under state law, "possesses final authority to establish municipal policy with respect to the action ordered." *Id.* at 481, 106 S.Ct. at 1299 (opinion of Brennan, J.) Two concurring justices questioned whether this definition was too broad. *See id.* at 486, 106 S.Ct. at 1301 (White, J., concurring); *id.* at 491, 106 S.Ct. at 1304 (O'Connor, J., concurring).

The Court revisited the policymaker question in *St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). There, the Court affirmed that state law provides a proper source for assessing who possesses final authority to establish municipal policy. *Id.* at 124, 108 S.Ct. at 924 ("the identification of policymaking officials is a question of state law") (opinion of O'Connor, J.); *id.* at 143, 108 S.Ct. at 934 ("state law will naturally be the appropriate starting point") (Brennan, J. concurring). A plurality suggested that where the municipal policymaker delegated some discretion to subordinates, the city could be liable only for the policymaker's delegation and supervision, not the subordinate's exercise of authority. The plurality noted, however, that "[i]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *Id.* at 127, 108 S.Ct. at 926 (opinion of O'Connor, J.).

In sum, *Tuttle* and *Pembaur* require plaintiffs to allege actual conduct by a municipal policymaker. *Praprotnik* insures

that only actions by officials relatively high up in the municipal hierarchy will produce municipal liability. The combination of the three cases necessarily molds many § 1983 claims against municipalities into "failure to train" or "failure to supervise" claims. It is only by casting claims in this way that plaintiffs can link an actual decision by a high level municipal official to the challenged incident.

In *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the Court addressed the dimensions of municipal liability for failure to train or supervise. Harris sued Canton alleging that the city had failed to adequately train its police as to when to summon medical care for an injured detainee. The Supreme Court ruled that a claim of inadequate training will trigger municipal liability only where "the failure to train amounts to deliberate indifference to the rights" of those with whom municipal employees will come into contact. *Id.* at 388, 109 S.Ct. at 1204.

The Court explained that "deliberate indifference" required that city policymakers made a "deliberate choice ... from among various alternatives" not to fully train employees. *Id.* at 389, 109 S.Ct. at 1205. Such a deliberate choice could be shown where "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.*

The Court offered as an example of deliberate indifference a municipality's failure to train police officers on the proper use of deadly force. The Court noted that "city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons." *Id.* at 390 n. 10, 109 S.Ct. at 1205 n. 10. Moreover, "[t]he city has armed its officers with firearms, in part to accomplish this task." *Id.* In such a situation, "the need to train officers in the constitutional limitations on the use of deadly force ... can be said to be 'so obvious' that failure to do so would proper-

ly be characterized as 'deliberate indifference' to constitutional rights." *Id.*

Even where the need to train or supervise would not be obvious to a stranger to the situation, a particular context might make the need for training or supervision so obvious that a failure to do so would constitute deliberate indifference. Thus, the Court suggested that "[i]t could also be that the police, in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers, who, nevertheless, are 'deliberately indifferent' to the need." *Id.*

From these examples, we discern three requirements that must be met before a municipality's failure to train or supervise constitutes deliberate indifference to the constitutional rights of citizens. First, the plaintiff must show that a policymaker knows "to a moral certainty" that her employees will confront a given situation. *Id.* Thus, a policymaker does not exhibit deliberate indifference by failing to train employees for rare or unforeseen events.

Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation. Whether to use deadly force in apprehending a fleeing suspect qualifies as a "difficult choice" because more than the application of common sense is required. Instead, police officers must adhere to the rule of *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), that deadly force may constitutionally be applied to a fleeing suspect only when "the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm" and when, "where possible, some warning has been given." *Id.* at 11–12, 105 S.Ct. at 1701. A choice might also be difficult where, although the proper course is clear, the employee has powerful incentives to make the wrong choice.

Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights. *City of Canton*, 489 U.S. at 390, 109 S.Ct. at 1205. Thus, municipal policymakers may appropriately concentrate training and supervision resources on those situations where employee misconduct is likely to deprive citizens of constitutional rights.

Where the plaintiff establishes all three elements, then we think it can be said with confidence that the policymaker should have known that inadequate training or supervision was "so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* With these principles in mind, we examine Walker's complaint to discern whether it states a claim upon which relief can be granted.

### III

In reviewing a motion to dismiss on the pleadings, "the factual allegations in the complaint must be accepted as true, and all reasonable inferences must be drawn in favor of the plaintiff." *Frazier v. Coughlin*, 850 F.2d 129, 129 (2d Cir. 1988). The district court should grant such a motion only if, after viewing plaintiff's allegations in this favorable light, "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Ricciuti v. New York City Transit Authority*, 941 F.2d 119 (2d Cir.1991).

Plaintiff's complaint makes the following allegations. First, Walker alleges that the district attorney's office failed to adequately train and supervise ADAs with respect to the obligation to turn over exculpatory evidence and to avoid the introduction of perjured evidence. Second, Walker asserts that the police department failed to adequately train and supervise officers as to the proper handling of exculpatory information and the duty to provide (and seek) truthful and accurate testimony. Walker also suggests that police and ADAs were not trained about a host of more general obligations. Distilled in light of the facts of this case, each of these more general allegations effectively restates the allegations listed above. We will consider these allegations in turn to determine whether any states a claim upon which relief can be granted.

### A. Claims against the police department.

Walker alleges that the police department failed to train and supervise police officers in two areas—the obligation not to commit or suborn perjury, and the duty to turn over exculpatory evidence. The district court found that neither allegation stated a claim upon which relief could be granted. With respect to the exculpatory evidence, the district court concluded, on the facts alleged in the complaint, that the police had fully complied with their constitutional obligations by turning over exculpatory evidence to the prosecutors. With respect to the perjury charge, the district court found that any failure to train did not constitute deliberate indifference, since "[a]ny reasonable police officer or lay person would be expected to know this without training."

### 1. Exculpatory evidence.

Walker alleges that the police department had no policy on the proper handling of exculpatory evidence. If true, this might, in the proper case, provide the basis for a deliberate indifference claim under the standards laid out above. On the facts alleged here, however, it is clear that any failure to train or supervise the police as to the handling of exculpatory evidence did not cause Walker's injury.

Walker alleges that Detective Powell conspired with ADA Zsuffa to suppress exculpatory evidence and to elicit perjured testimony. Walker does not allege, however, that Detective Powell or any other police officer concealed any exculpatory evidence from the prosecution team. Thus, in order for the police department's failure to train to have any causal connection to Walker's injury, it must be the case that police officers have an obligation with respect to exculpatory evidence beyond dis-

closing that evidence to the prosecutor. We do not believe that such an obligation exists.

The constitutional duty to disclose exculpatory evidence to the defense has its roots in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In *Brady*, the Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady* does not discuss the relative disclosure obligations of police and prosecutor.

Subsequent cases, however, have suggested that the police satisfy their obligations under *Brady* when they turn exculpatory evidence over to the prosecutors. *See Campbell v. Maine*, 632 F.Supp. 111, 121 (D.Me.1985), *aff'd*, 787 F.2d 776 (1st Cir.1986); *Hauptmann v. Wilentz*, 570 F.Supp. 351, 389 (D.N.J.1983), *aff'd*, 770 F.2d 1070 (3d Cir.1985), *cert. denied*, 474 U.S. 1103, 106 S.Ct. 887, 88 L.Ed.2d 922 (1986). *But see Hilliard v. Williams*, 516 F.2d 1344 (6th Cir.1975), *vac'd on other grounds*, 424 U.S. 961, 96 S.Ct. 1453, 47 L.Ed.2d 729 (1976). We agree. It is appropriate that the prosecutors, who possess the requisite legal acumen, be charged with the task of determining which evidence constitutes *Brady* material that must be disclosed to the defense. A rule requiring the police to make separate, often difficult, and perhaps conflicting, disclosure decisions would create unnecessary confusion. It also would ignore the fact that the defendant's appropriate point of contact with the government during litigation is the prosecutor and not those who will be witnesses against him. Since Walker has alleged that the police shared all exculpatory evidence with the prosecutors, Walker's claim against the police relating to the suppression of exculpatory evidence fails to state a claim upon which relief can be granted. We affirm the district court's dismissal of this element of Walker's complaint.

Walker contends, however, that we should not read his allegations so strictly.

He points out that, contrary to his allegations, discovery may reveal that the police did suppress evidence from the prosecution. This is not really an objection to the dismissal of this portion of the complaint, as pled. Rather, Walker is asserting a right to replead the complaint in the event later discovery yields new evidence contradicting his pleadings. We think such a request to replead should properly be addressed to the district court on remand as circumstances may warrant.

### 2. Perjury.

Walker also contends that the police department had an obligation to train and supervise officers not to commit perjury or aid in the prosecution of the innocent. The district court rejected these claims on the theory that the police officer's obligation not to commit or suborn perjury or prosecute the innocent are obvious.

Walker contends that his allegations meet the deliberate indifference threshold set by *City of Canton*. That is, city policymakers know to a moral certainty that police officers will be presented with opportunities to commit perjury or proceed against the innocent. Moreover, a failure by police officers to resist these opportunities will almost certainly result in deprivations of constitutional rights. Accordingly, Walker contends, that just as municipalities have a duty to train officers in the constitutional limits on the use of force in apprehending criminals, so too must municipalities train and supervise their officers with respect to the obligation not to commit perjury or assist in the prosecution of the innocent.

Walker's argument misses a crucial step. It is not enough to show that a situation will arise and that taking the wrong course in that situation will result in injuries to citizens. As laid out above, *City of Canton* also requires a likelihood that the failure to train or supervise will result in the officer making the wrong decision. Where the proper response—to follow one's oath, not to commit the crime of perjury, and to avoid prosecuting the innocent—is obvious to all without training or

supervision, then the failure to train or supervise is generally not "so likely" to produce a wrong decision as to support an inference of deliberate indifference by city policymakers to the need to train or supervise.

■ That general rule, however, does not apply in every case. While it is reasonable for city policymakers to assume their employees possess common sense, where there is a history of conduct rendering this assumption untenable, city policymakers may display deliberate indifference by doing so. If Walker can produce some evidence that policymakers were aware of a pattern of perjury by police officers but failed to institute appropriate training or supervision, his claim can survive summary judgment.

Walker has not expressly alleged a history of police perjury. Nonetheless, it does not appear "beyond doubt" that Walker cannot prove this "set of facts in support of his claim which would entitle him to relief." *Ricciuti v. New York City Transit Authority,* 941 F.2d 119 (2d Cir.1991). Walker should be allowed to pursue discovery in order to determine whether there was a practice of condoning perjury (evidenced perhaps by a failure to discipline for perjury) or a pattern of police misconduct sufficient to require the police department to train and supervise police officers to assure they tell the truth. Accordingly, we reverse the district court's dismissal of Walker's claims alleging the city's deliberate indifference to the need to train and supervise the police not to commit perjury or assist in the conviction of the innocent.

**B. Claims against the District Attorney's Office.**

■ Walker assails the District Attorney's office's lack of training and supervision relating to ADAs' obligations to disclose exculpatory evidence and to avoid the use of perjured evidence. The district court concluded that Walker had failed to state a claim against the municipality, since each obligation should have been obvious without training. With respect to the use of perjured evidence, we disagree with the district court for the reasons set out above in the discussion of the police training claim. We also disagree with the district court's determination that a prosecutor's obligations under *Brady* are so obvious as to require no training.

Reading Walker's complaint in a light most favorable to Walker, we conclude that a complete failure by the DA in 1971 to train ADAs on fulfilling *Brady* obligations could constitute deliberate indifference sufficient to give rise to § 1983 municipal liability. First, the district attorney knows to a moral certainty that ADAs will acquire *Brady* material. Second, contrary to the district court, we do not think that in 1971, just seven years after *Brady* was decided, that the *Brady* standard was so obvious or easy to apply as to require, as a matter of law, no training or supervision.

Indeed, the evidence withheld in this case, though clearly *Brady* material, was not of the sort that one would obviously turn over, absent some knowledge of *Brady.* That is, there might have been no need in 1971 to train ADAs to disclose direct evidence that the accused was elsewhere at the time of the crime. But, it might not have been obvious in 1971 that ADAs should turn over all information of the sort at issue here—evidence impeaching the accusing witness or revealing a lineup misidentification but not directly establishing the innocence of the accused. Because the proper course of conduct was not at all obvious in 1971 absent some training in the intricacies of *Brady*, a jury could find that the complete failure to train or supervise alleged here would likely result in ADAs making the wrong choices about turning over this kind of *Brady* material. We express no view as to whether such a jury finding would be supportable in other time periods or with respect to other kinds of exculpatory evidence. Finally, withholding *Brady* material will virtually always lead to a substantial violation of constitutional rights. We think Walker has adequately alleged deliberate indifference by the district attorney.

**IV**

■ Having determined that Walker has properly alleged deliberate indifference

by the district attorney, the question remains whether or not the district attorney is a municipal policymaker. The City contends that the district attorney is a state official, and therefore that his deliberate indifference cannot trigger municipal liability.

The City finds some support for its view in *Baez v. Hennessy,* 853 F.2d 73 (2d Cir. 1988), *cert. denied,* 488 U.S. 1014, 109 S.Ct. 805, 102 L.Ed.2d 796 (1989). There, plaintiff brought a § 1983 suit seeking to hold the County of Onondaga liable for an ADA's attempt to prosecute the plaintiff after a grand jury declined to return an indictment. We held that "when prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State, not the county." *Id.* at 77. Accordingly, we ruled that a district attorney's misconduct in prosecuting an individual could not give rise to municipal liability. *Baez,* however, involved a challenge to the decision by an ADA to prosecute an individual and the district attorney's endorsement of that decision. Here, by contrast, Walker is challenging the district attorney's management of the office—in particular the decision not to supervise or train ADAs on *Brady* and perjury issues.

In *Gentile v. County of Suffolk,* 926 F.2d 142 (2d Cir.1991), we held that a county could be held liable for a county district attorney's long practice of ignoring evidence of police misconduct and sanctioning and covering up wrongdoing. In *Gentile,* we confined *Baez* to challenges to "specific decision[s] of the District Attorney to prosecute." *Id.* at 152 n. 5. We think *Gentile,* not *Baez,* controls here. Where a district attorney acts as the manager of the district attorney's office, the district attorney acts as a county policymaker.

There is an added complexity in this case because Walker is suing the City of New York, not Kings County. It is possible that an official could be a policymaker for one of New York City's constituent counties without being a policymaker for the City. However, Walker alleged, and the City conceded below, that the county district attorneys within the City have final, discretionary authority to implement training and supervision within their own office. Since the City has conceded that no City official has veto authority over training or supervision decisions by the county district attorney, we hold that the Kings County District Attorney acted as a municipal policymaker in this case. *See Pembaur,* 475 U.S. at 481–85, 106 S.Ct. at 1299–1301 (opinion of Brennan, J.). Accordingly, Walker's allegations of deliberate indifference by the District Attorney provide a proper basis for holding the City liable.

*Conclusion*

The Supreme Court has made clear that § 1983 does not subject municipalities to liability whenever municipal employees go astray. It is only when the municipality itself wreaks injury on its citizens that municipal liability is appropriate. Here, plaintiff Walker has catalogued a host of misdeeds by city employees that led to his wrongful imprisonment. Some of these misdeeds relate to such basic norms of human conduct—the duty not to lie or persecute the innocent—that in the ordinary case a municipal policymaker need not expend precious resources on training or supervision but can instead rely on the common sense of her employees. However, in this case discovery may reveal a pattern of misconduct sufficient to turn such apparently reasonable reliance into deliberate indifference. In that event, liability may fairly be laid at the City's doorstep. Even absent such evidence, we think that Walker has properly alleged that a particular municipal action—the failure to train and supervise prosecutors to insure that they meet their constitutional obligation to turn over exculpatory material to the defense—caused his injuries. Accordingly, we conclude that the district court erred in dismissing Walker's complaint. We reverse and remand for further proceedings consistent with this opinion.

Reversed and remanded.