Maria CARRERO, Plaintiff,

v.

NEW YORK CITY HOUSING
AUTHORITY, Defendant.

No. 96 Civ. 1535(LAK).

United States District Court,
S.D. New York.

Aug. 19, 1997.

Michael H. Sussman, Helen G. Ullrich, Sussman Bergstein & Wotorson, Baltimore, MD, for Plaintiff.

Lanny R. Alexander, Elyse R. Hilton, Jeffrey Schanback, General Counsel, New York City Housing Authority, New York City, for Defendant.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Plaintiff brings this action pursuant to 42 U.S.C. § 1983 to recover against the New York City Housing Authority (the "Authority") for alleged (i) sexual harassment by co-workers in violation of her right to equal protection of the laws, and (ii) retaliation for her previous lawsuit against the defendant and others in violation of the First and Fourteenth Amendments. Defendant moves for summary judgment dismissing the complaint. For the reasons stated below, defendant's motion is granted in substantial part.

### Facts

As defendant has the burden of establishing that there is no genuine issue as to any material fact, the Court views the record in the light most favorable to the plaintiff.

### The Prior Litigation

Plaintiff Maria Carrero has been employed by the Authority since 1981. (Alexander Reply Aff. Ex. G) In 1986, she brought an action in this Court for sexual harassment and retaliation pursuant to Title VII of the Civil Rights Act of 1964, as amended, and 42 U.S.C. § 1983 claiming that her immediate supervisor, Miguel Peterson, had subjected her to both hostile environment and *quid pro quo* sexual harassment ("*Carrero I*"). After a bench trial, Judge Sweet held that Peterson was liable for sexual harassment on both theories. He further held that the Authority was not liable for Peterson's creation of a hostile work environment because Peterson acted outside the scope of his employment, but that it was liable for Peterson's *quid pro quo* harassment. *Carrero v. New York City Housing Authority,* 668 F.Supp. 196 (S.D.N.Y.1987). The district court issued a decree requiring the Authority to conduct a

training program on sexual harassment for any males working with Carrero and, more generally, directed the Authority "to take all necessary steps to ensure to the maximum extent practicable that plaintiff shall not be subjected to any threat or any other act at the hands of Authority agents or employees in retaliation for plaintiff's complaints which were the subject of the proceedings which led to [the] Court Order, or in retaliation for any refusal by plaintiff hereafter to submit to sexual advances or for any complaint hereafter made by plaintiff to the Authority regarding sexual harassment or discrimination."[1] (Sussman Aff. Ex.1) There is no evidence that the Authority conducted any training program in response to the decree.

*Plaintiff's Initial Round of Allegations and the Authority's Response*

*Carrero's Return to the Authority and the Alleged Wise Towers Incidents*

By the time of Judge Sweet's decision in *Carrero I*, Carrero was on a lengthy leave of absence. She first returned to her job as heating plant technician in February 1988 and was assigned to the Amsterdam Houses. (Alexander Reply Aff. Ex. G) As far as the record discloses, there was no incident brought to the Authority's attention until April 1992.[2] Thus, while the Court assumes for purposes of this motion that the Authority took no special steps to train Carrero's co-workers upon her return from leave, more than four years passed without any incident known to the Authority once she did return, roughly half the period before and roughly half after the entry of the *Carrero I* decree.

Plaintiff was transferred to Wise Towers in April 1992. Immediately after her arrival, she complained to her immediate supervisor that two other employees had made highly offensive, gender oriented remarks and that an offensive note had been attached to her time card. (Sussman Aff. Exs. 3, 4) The supervisor investigated the complaint, but initially was hampered by Carrero's inability or unwillingness to identify the makers of the offensive remarks. Approximately two weeks after the first of the alleged remarks, however, Carrero identified the alleged maker of the first comment by name. The manager who investigated Carrero's complaints then confronted the individual whom plaintiff had identified, but that individual flatly denied Carrero's allegation. The manager was unable to identify the source of the offensive note and the second alleged remark. In June 1992, in the wake of these events, the Authority held a seminar, sponsored by its Department of Equal Opportunity ("DEO"), concerning sexual harassment in the workplace for all Wise Towers maintenance personnel.[3] (Sussman Aff. Ex. 3) As far as the record discloses, Carrero's remaining tenure at Wise Towers was uneventful.

*The Alleged Bathroom Incidents*

On October 1, 1992, Carrero was transferred as a "loaner" to a housing complex called Lower East Side II ("LES II"). The only controversy concerned the alleged lack of a locker for plaintiff's use in storing her street clothes and personal possessions. While the timing and some of the details are not entirely clear, Carrero's allegedly contemporaneous diary[4] notes, dated in early

1. The Second Circuit affirmed in part and reversed in part. *Carrero v. New York City Housing Auth.*, 890 F.2d 569 (2d Cir.1989).

2. The errata sheet to plaintiff's deposition states that a Mr. Quinones exposed himself to her while she was at Seward Park. As the portion of plaintiff's employment record submitted on the motion shows that she was assigned to Amsterdam Houses continuously from February 3, 1988 at least through January 1, 1991, this alleged incident must have occurred after that date and before her transfer to Wise Towers in April 1992. (*See* Alexander Aff. Ex. G) There is no evidence that this matter was brought to the Authority's attention.

3. Plaintiff made a complaint to the New York State Division of Human Rights on April 23, 1992 concerning these events. (Alexander Aff. Ex. F) She suggested at oral argument that the training seminar was held in response to that complaint. There is no evidence, however, that the Authority learned of the complaint before the seminar was held.

4. Plaintiff's papers in opposition to the motion included number of handwritten pages which are referred to in her brief as her diary. (Sussman Aff. Ex. 6) She submitted no affidavit or other sworn evidence as to what the three pages are, when they were created, and whether they are complete. The Court nevertheless assumes *arguendo* that the document is properly before it.

January 1993, states that she then had been without a locker for the second week. There is no evidence, however, that she reported the problem at this time. The diary entry for April 7, 1993, moreover, states that Carrero alerted her immediate supervisor, Assistant Superintendent Leon Howard, of the problem on that date. (*Id.* Ex. 6) On April 8, 1993, Carrero was given a locker and a changing room, although the room was dirty. (*Id.*) After she began to clean it, she called Carmito Ortiz, the Superintendent of LES II, who sent three other employees to help her. (*Id.*) Later that day, she was told that she had been transferred to Chelsea Houses. (*Id.*) Thus, Carrero spent seven months at LES II without voicing any complaint of sexual harassment or retaliation.

Carrero worked at Chelsea Houses for less than a month and then was transferred to Carver Houses. In August 1993, plaintiff saw a posting for a permanent position as a heating plant technician at LES II and applied for it. Although she claims that Ortiz was unfriendly when she called him about the opening, she was the only applicant and therefore was transferred back to LES II in November 1993. (Ortiz Dep. 13)

Carrero's responsibilities at LES II included not only the heating plants in the five buildings in that complex, but the boiler rooms at Bracetti Houses, which were four or five blocks away. There was one women's bathroom in the LES II building at 86 Avenue C, while men and women employees shared a single bathroom at Bracetti Houses. (Carrero Dep. 36–37) In April 1994, Carrero entered the bathroom at Bracetti Houses, the door to which was open, and saw a man at a urinal who then turned and faced her while still holding his penis in his hand. (*Id.* 40) There is no evidence, as distinguished from speculation, as to whether the man in

question was aware that anyone, let alone a woman, had entered the bathroom before he turned. (*See id.* 45–46) Carrero told him to close the door, walked out, and complained to Howard, who immediately posted a handwritten sign on the bathroom door advising that the door should be closed when the room was in use because "female workers work here too." (*Id.* 43, 45; Sussman Aff. Ex. 9) Nevertheless, a similar incident, involving a different male employee, allegedly took place three months later. (Carrero Dep. 49, 51–53) Carrero complained to Howard, but there is no evidence as to what, if anything, was done in regard to her complaint.[5]

### Howard's Alleged Harassment

On July 22, 1994, Carrero was in Howard's office. She was wearing a shirt with two front pockets in the left of which were two pens. According to plaintiff, Howard reached out and grabbed her left breast. She pushed his hand away and protested. Howard, Carrero testified. said that he had been reaching for a pen and that he had touched Carrero by accident. (*Id.* 73–74) Carrero did not then report the incident to anyone. (*Id.* 74; Sussman Aff. Ex. 11)

Five days later, Carrero says, Howard ordered her to have lunch with her, a demand to which see acceded after he threatened to charge her with insubordination. A few days later. Howard again asked Carrero to have lunch with him and threatened to change her shift in the following summer. (Sussman Aff. Ex. 11) After another few days, Howard entered the boiler room at the Bracetti Houses while Carrero and another heating plant technician were working. According to plaintiff, Howard again grabbed her breast and allegedly did so once more on August 17, 1994.[6] (Carrero Dep. 76; Sussman Aft. Ex. 11)

Moreover, although it gives every indication of being a recreation prepared long after the events it relates—for example, most of the entries are identified only by month and year, not date, and the entry for March 1993 refers to events that allegedly occurred in April 1993—the Court assumes further that the document was prepared roughly contemporaneously.

**5.** There is no evidence that any Authority supervisor other than Howard was aware of either

incident until Carrero's subsequent complaints about other incidents prompted a broad investigation. (*See* Carrero Dep. 47)

**6.** According to the investigative report described below, the other Authority employee who was present recalled that he, Carrero and Howard all were in the boiler room working on the boiler. Howard was trying to show Carrero which wires were "hot" and asked her for the electrical tester she had in her breast pocket. Although the co-

## The Investigation

The alleged incidents in the summer of 1994 that involved Howard precipitated a complaint by Carrero to the New York State Division of Human Rights, which in turn resulted in the Authority's assignment of Lynn Leopold, a former assistant district attorney and a chief at the Authority's DEO, to investigate plaintiff's claims. The investigation focused initially on the complaints concerning Howard detailed immediately above. After Leopold interviewed Carrero, it was expanded to embrace Carrero's other allegations, including the alleged failure of male employees to close bathroom doors. (Leopold Aff. ¶¶ 7–8)

Leopold interviewed thirteen Authority employees and wrote a detailed report. (*Id.* ¶¶ 10–11 & Ex. A) She concluded, *inter alia,* that (1) some male staff members had failed to lock bathroom doors, but that none had done so intentionally to harass Carrero; (2) there was no corroborating evidence that any male employee deliberately had exposed himself to Carrero; (3) male co-workers had acknowledged that they may have removed an item such as a pen from Carrero's shirt pocket on a couple of occasions; (4) there was no independent evidence that Howard had treated Carrero differently from anyone else; and (5) there was no corroboration of Carrero's charge that Howard ordered her to have lunch with him under threat. (*Id.* ¶ 12)

Although Leopold found no intentional sexual harassment or gender discrimination, and found no corroboration for Carrero's allegations regarding employees grabbing at her breast, she concluded that it was inappropriate for employees to remove items from shirt pockets of others. She recommended that the employees at LES II be given sensitivity training concerning sexual harassment and discrimination and orally counseled Howard

worker did not see what happened, he heard Carrero say "you touched my breast." Howard responded that he was sorry, but that he needed the tester. The co-worker thought the incident an accident. (Leopold Aff. Ex. A, at 11)

7. Plaintiff complains that she was "excluded" from the meeting. (Pl. Mem. 10) The meeting, however, was of the janitorial staff. Carrero was a heating plant technician and thus not part of the group for which the meeting was held.

herself (*id* ¶ 13), as did Superintendent Ortiz (Ortiz Aff. ¶ 2)

## Plaintiff's Later Allegations and the Authority's Response

During the period November 1994 through April 1996, Carrero allegedly was the victim of a number of incidents of sexual harassment and retaliation. To the extent that these were brought to the attention of her supervisors and the DEO, all were looked into and, where substantiated, dealt with as the following listing demonstrates:

1. In November 1994, Carrero complained to Superintendent Ortiz that a male employee named Velez grabbed her breast while both were off duty and off Authority premises. Ortiz nevertheless spoke to Velez about the incident. (Ortiz Aff. ¶ 3) Velez apologized to Carrero, telling her that he had heard a rumor that Carrero had reported Howard for grabbing her breast and that he wanted to see if she would report him as well. (Carrero Dep. 83–86)

2. In May 1995, Carrero and the other female employee at LES II complained to Superintendent Torres, who had replaced Ortiz, that there were feces on the toilet top and urine on the floor in the women's rest room. They requested that the lock be changed and new keys issued to them alone. (Sussman Aff. Ex. 14) Torres responded by changing the locks and issuing keys only to the female employees and the caretaker. A meeting was held with the janitorial staff [7] at which the importance of "gender correct usage" and cleanliness of the bathrooms was stressed. (Alexander Reply Aff. Ex. C) Shortly thereafter, plaintiff sent a memorandum to Torres in which she thanked him "for solving the problem with the lady's [*sic*] bathroom." [8] (*Id.* Ex. D; Sussman Aff. Ex. 16)

8. Plaintiff testified in her deposition that nothing was done when she reported the problem to Torres. (Carrero Dep. 61) This is contradicted by her own memorandum. (Sussman Aff. Ex. 16) Plaintiff's counsel conceded at oral argument that Carrero's deposition testimony was inaccurate.

3. On February 26, 1996, plaintiff submitted a formal complaint to the DEO regarding alleged harassment concerning work schedules and access to tools. (Sussman Aff. Ex. 22) An investigator was assigned to the complaint and conducted a thorough investigation. (Angalada Aff. ¶¶ 3–9) He concluded that the interviews and evidence did not support plaintiff's allegations. (*Id.* ¶ 9 & Ex. A)

4. On April 12, 1996, Carrero complained to the DEO that a resident caretaker position for which she allegedly had applied had been given to a less qualified employee. Investigator Angalada conducted an investigation that included interviews of all those involved, including the individual who was awarded the position. Messrs. Torres and Roth, who selected the successful applicant, told the investigator that they had been unaware of Carrero's application for the position, but that they would not have offered her the job in any case because she lacked the necessary all-around maintenance skills. The investigator concluded that Carrero's allegations were not supported by the evidence. (*Id.* ¶¶ 10–15 & Ex. B)

Plaintiff's papers refer to a handful of other alleged incidents, none of which warrants extended discussion. One pertains to Carrero's complaint that a female co-worker falsely accused her of refusing to accept an oil delivery. A couple involve claims that Carrero was asked to work alone in what the Court assumes she regarded as hazardous places or activities (Sussman Aff. Ex. 17), claims that were resolved by a directive from the LES II manager that heating plant technicians were to work in pairs (*id.* Ex. 18). The other relates to a disagreement between Carrero and Assistant Superintendent Arce on April 26, 1996. Carrero claims that Arce ordered her to clean boiler tubes without assistance; Arce claims that Carrero made "slanderous remarks" about him in the log book and spoke in "a loud almost screaming manner." Carrero admits that she called Arce a liar. (Sussman Aff. Ex. 25) There is no evidence that any of these events came to the attention of more senior Authority personnel before this litigation or was the subject of complaints to the DEO.

*The Authority's Policies*

The Authority maintains an active policy against sexual discrimination. It distributed this policy to employees on multiple occasions, including in 1989, through the New York City Housing Authority Bulletin. In 1987, the Authority issued and disseminated its Supervisor's Guide to Equal Opportunity and Affirmative Action. It was reissued in 1992 containing the Authority's sexual harassment policy statement. In October of 1992, the Authority's general manager distributed to all superintendents, managers, district chiefs and department heads a memorandum warning that the Authority would not tolerate any sexual harassment or other discrimination and would respond with disciplinary action. In November of 1993 and again in January, February and August of 1995 the Authority distributed its sexual harassment policy, which stated that sexual harassment is clearly prohibited, to all managers and supervisors. The Authority instructed them to post the policy in places accessible to staff. (Martinez Aff. ¶¶ 5–9 & Ex. E) As the Second Circuit explained in *Carrero I,* the Authority's "stated policies are explicitly non-discriminatory." 890 F.2d at 577.

*Discussion*

If this were a motion by Carrero's alleged harassers, the existence of genuine issues of material fact would be so obvious that extended analysis would be unnecessary. But it is not. The alleged harassers are not defendants in this action. The suit is against the Authority, which cannot be held liable under Section 1983, the only statute invoked by Carrero, unless the acts of which Carrero complains—and which the Court assumes for purposes of this motion occurred—were caused by an official policy or practice of the Authority.[9]

The record in this case unequivocally shows, as indeed the Second Circuit held in the prior litigation involving Carrero, that

---

9. *City of Canton v. Harris,* 489 U.S. 378, 390–91, 109 S.Ct. 1197, 1205–06, 103 L.Ed.2d 412 (1989); *Monell v. Department of Social Services,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978).

the Authority's policies are entirely non-discriminatory. The only question is whether plaintiff has raised a genuine issue of fact as to the Authority's liability for the alleged actions of her co-workers on any of three legal theories: (1) failure properly to train its employees, which could give rise to liability under *City of Canton v. Harris*, (2) failure adequately to investigate plaintiff's complaints, or (3) retaliation.[10] With a very narrow exception, she has failed to meet this burden.

*Failure to Train*

■ Plaintiff asserts that the Authority, by virtue of her previous suit and her situation as one of few females in her position, was on notice that she was likely to be harassed and retaliated against when she returned to work. The Authority, she argues, therefore should be liable for failing to hold training programs before she arrived at the various work sites or immediately upon her making any complaints.

The responsibility of municipalities to train their employees to avoid sexual harassment and other misconduct and to investigate allegations of such misbehavior are important but not unlimited:

"Only where a municipality's failure to train its employees in a relevant aspect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983 ... It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policy makers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 389–390, 109 S.Ct. at 1205.

"[D]eliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents. To prove such deliberate indifference, the plaintiff must show that the need for more or better supervision to protect against Constitutional violations was obvious." *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir.1995); *see also Ricciuti v. New York City Transit Authority*, 941 F.2d 119, 123 (2d Cir.1991). This requirement of obviousness is a substantial one:

"[T]hree requirements ... must be met before a municipality's failure to train or supervise constitutes deliberate indifference to the constitutional rights of citizens. First, the plaintiff must show that a policy maker knows 'to a moral certainty' that her employees will confront a given situation. Thus, a policy maker does not exhibit deliberate indifference by failing to train employees for rare or unforeseen events. Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation.... Finally, the plaintiff must show that the wrong choice

**10.** Plaintiff set out a fourth theory in her brief—that the Authority violated the *Carrero I* decree—but explicitly dropped it at oral argument. In any event, the argument would have been fruitless.

The decree in the earlier lawsuit, while issued for the purpose of remedying violations of Title VII of the Civil Rights Act of 1964 and Section 1983, did not create any such rights. privileges or immunities. The remedy for any violation of the decree is to be found exclusively in an appropriate application before Judge Sweet in the earlier case.

*Candelaria v. Coughlin*, No. 93 Civ. 3212(RWS), 1994 WL 707004 (S.D.N.Y. Dec. 19, 1994), is directly on point. The court there dismissed the claims based on a decree in a previous case, as distinguished from those brought under the Constitution. It held that the remedial provisions of the decree were not coextensive with the Constitution and, in any case, that "remedial decrees ... do not, of themselves, give rise to constitutional claims for damages under § 1983 ..." *Id.* at *8. Every other case this Court has found is to precisely the same effect. *DeGidio v. Pung*, 920 F.2d 525, 534 (8th Cir.1990); *Green v. McKaskle*, 788 F.2d 1116, 1123 (5th Cir.1986); *Gayle v. Howard*, slip op., 93 Civ. 3267 (S.D.N.Y. Jan. 4, 1994); *Kaminsky v. Rosenblum*, 737 F.Supp. 1309, 1317 (S.D.N.Y.1990).

by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of New York,* 974 F.2d 293, 297–98 (2d Cir.1992), *cert. denied,* 507 U.S. 961, 113 S.Ct. 1387, 122 L.Ed.2d 762 (1993): *see Ferreira v. Westchester Co.,* 917 F.Supp. 209 (S.D.N.Y. 1996) (plaintiff can survive summary judgment only by producing evidence that policy makers knew of a pattern of impermissible conduct but failed to respond).

Plaintiff contends that the Authority should have provided training to her co-workers before her arrival at each site, as the Authority was aware that she previously had suffered harassment. The claim, for the most part, does not withstand analysis.

The fact that Carrero had brought and, indeed, in 1987 prevailed in *Carrero I* was sufficient to put the Authority on notice that she was vulnerable to sexual harassment.[11] Hence, it is at least arguable that the Authority should have conducted training for plaintiff's co-workers at or before her return from her leave of absence in 1988. On this record, the plaintiff is entitled to the assumption that it did not do so. Nevertheless, it is critically important to recognize that there was no incident whatever during Carrero's stay at Amsterdam Houses. By the time Carrero was shifted to Seward Park Houses in some time after January 1991, she had been back at work for approximately three years or more without any untoward incident. Assuming that it was "obvious" when Carrero returned to her job in February 1988, after winning her lawsuit, that she required protection against sexual harassment and retaliation, the passage of three more years without any apparent problem certainly reduced any such need. Hence, any culpable failure by the Authority to train Carrero's co-workers at Amsterdam Houses when she returned to the job resulted in no harm to the plaintiff. Moreover, given the placid intervening years that followed her return to work, no reasonable trier of fact could conclude that the Authority's failure to provide special training for Carrero's new co-workers at Seward Park when she arrived there in 1991 or early 1992 reflected deliberate indifference to her rights. Hence, the Authority cannot be held responsible for the one incident that allegedly occurred at Seward Park, which is described in note 2. *See Canton,* 489 U.S. at 391, 109 S.Ct. at 1206 (failure to train must be "closely related to ultimate injury"); *Walker,* 974 F.2d at 298 (same).

Plaintiff's next assignment was at Wise Towers, and there is no denying that the conduct with which she allegedly was greeted there was reprehensible. Nonetheless, responsibility for that behavior cannot be laid at the Authority's doorstep on a failure to train theory for the same reasons. When plaintiff arrived at Wise Towers in April 1992, she had, to the best of the Authority's knowledge, been free of sexual harassment on the job for over four years.[12] The Authority—the general policies of which are unexceptionable—cannot be held responsible for failing to take additional special precautions to prevent sexual harassment of someone who had not made any allegations of harassment over such a lengthy period. A "policymaker does not exhibit deliberate indifference by failing to train employees for rare or unforeseen events." *Walker,* 974 F.2d at 297.

Plaintiff's next place of employment was LES II, where she arrived on October 1, 1992. In the almost six months during which she was at LES II on her first tour of duty there. the only incident Carrero has mentioned is the alleged delay from January until April in receiving a locker and changing area.[13] According to Carrero's own diary account, however, Carrero did not inform anyone about her concern over not having a

---

11. Indeed, Carrero's assertion of claims, regardless of their validity, probably would have been sufficient to put defendant "on notice that there was a possibility of an unconstitutional policy." *Fiacco v. City of Rensselaer,* 783 F.2d 319, 328 (2d Cir.1986), *cert. denied,* 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987).

12. As noted, there is no evidence that the incident at Seward Park was disclosed to anyone at the Authority until after the commencement of this action. *Supra* note 2.

13. Carrero acknowledged that there was a women's bathroom available to her at LES II. (Carrero Dep. 36–37)

locker until April 7, 1993. On April 8, 1993 she received the locker, and a room was set aside for her as a changing area. (Sussman Aff. Ex. 6) Carrero acknowledged that Ortiz sent three people to help her clean the room as soon as she complained that it was dirty. (*Id.*)

Those at LES II perhaps might have been sufficiently attentive to Carrero to have discerned—in the absence of a complaint from Carrero—her need for a locker and a space, other than the women's rest room, in which to change. It perhaps might be debated whether their apparent lack of sensitivity, were it attributable to the Authority, would be actionable. But there is no need for debate because any such deficiency on their part is not so attributable on a failure to train theory. There is simply no reason to suppose that the lack of a locker was causally related to failure to train.

After uneventful sojourns totaling seven months at the Chelsea and Carver Houses. Carrero returned to LES II in November 1993. This second tour of duty was marked by the incidents, among others, in which Howard allegedly grabbed Carrero's breast and insisted that she join him for lunch. By the date of Carrero's return to LES II, however, she had been employed continuously, following her leave, for 57 months without any allegation of discrimination, harassment or retaliation of which the Authority was aware. Hence, there simply was no obligation to provide additional training to the LES II employees in advance or at the time of plaintiff's November 1993 return. Plaintiff therefore fails to meet the first prong of *Walker* with respect to the April 1994 bathroom incident and Howard's alleged actions in the summer of 1994. *See Walker*, 974 F.2d at 297.

█ The Howard incident, as described above, precipitated a complaint to the New York State Division of Human Rights and the Leopold investigation. At that point, the Authority was on notice that Carrero claimed once again to have encountered sexual harassment on the job. In light of the acknowledgment by one or more male co-workers that they may have removed items from Carrero's shirt pocket on a couple of occasions, a trier of fact reasonably could find that the Authority was aware at that point that plaintiff was at risk of being subjected to a hostile work environment. While both Leopold and Ortiz counseled Howard, Leopold's recommendation that employees at LES II be given sensitivity training evidently was not followed. Hence, to the extent that a trier reasonably could conclude that any subsequent incidents were causally related to the Authority's failure to train Carrero's co-workers after the Howard incidents, plaintiff is entitled to a trial limited to those issues.

The November 1994 incident involving Velez, if it occurred, meets the legal test of harassment, to say the least. Nor can harassment be excluded as a basis of the May 1995 bathroom incident. Moreover, a jury might conclude that neither of these incidents would have occurred had the Authority followed Leopold's recommendation.[14] In consequence, plaintiff's evidence on these two incidents alone is sufficient to defeat summary judgment on. the failure to train theory.[15]

*Failure to Investigate*

█ Plaintiff seeks support for her claim on the additional ground that the Authority did not investigate adequately her subsequent complaints. This claim is entirely unpersuasive.

The Wise Tower incidents took place in April of 1992. They were investigated promptly. Approximately two months after the alleged harassment, the Authority held a seminar on sexual harassment for all personnel. Plaintiff suggests that the two month

14. The parties have not briefed the question whether the Authority may be held liable for Velez's actions, even given a causal connection between the failure to train and the incident, in light of the fact that the event in question occurred off the Authority's premises and unrelated to Velez's employment. The Court therefore will not decide that issue at this time.

15. There is nothing to suggest that the failure to award plaintiff the resident caretaker position for which she applied was a product of sexual harassment or retaliation. Plaintiff has not asserted a more general claim of gender discrimination with respect to this incident.

delay in holding the seminar evidences deliberate indifference on the part of the Authority. In the two months between the incident and the seminar, the Authority investigated the harassment, confronted the perpetrator, scheduled and held a seminar. The Court finds little evidence of delay of any sort, let alone deliberate indifference, on the part of the Authority.

The alleged harassment by Howard, the next incident that plaintiff brought to the Authority's attention, also was handled in a manner negating any claim of deliberate indifference to plaintiff's rights. The Authority placed a well qualified person in charge of investigating plaintiff's allegations. The investigator wrote a detailed report and personally counseled Howard as did his immediate supervisor. Carrero's February 26, 1996 and April 12, 1996 complaints to the DEO were investigated thoroughly. Every other complaint that Carrero brought to the attention of her immediate supervisors was dealt with promptly and appropriately.

Because plaintiff has failed to demonstrate the existence of any material issue of fact as to the claim of failure to investigate her complaints, defendant's motion will be granted as to this aspect of the complaint.

*The Retaliation Claim*

■ Plaintiff alleges that she was harassed in retaliation for having brought the prior lawsuit and other complaints of sexual harassment against the Authority and certain of its employees in violation of the First Amendment.

It is important at the outset to note the distinction between retaliation cases brought under Title VII of the Civil Rights Act of 1964 and Section 1983, respectively. Title VII specifically provides a cause of action in favor of persons who are victims of retaliation for making complaints and bringing litigation under that statute. 42 U.S.C. § 2000e–2. Section 1983, under which this action is brought, does not. A Section 1983 retaliation plaintiff therefore may prevail only if the defendant violated her constitutional rights. In consequence, "[a] public employee who claims to have been discharged or disciplined for the exercise of First Amendment rights must establish two elements to prevail on the claim: (1) the conduct at issue must have been protected speech. and (2) the protected speech must have played a substantial part in the employer's adverse employment action, *i.e.*, that the adverse action would not have occurred *but for* the employee's protected actions." *Ezekwo v. N.Y.C Health & Hospitals Corp.*, 940 F.2d 775 (2d Cir.), *cert. denied,* 502 U.S. 1013, 112 S.Ct. 657, 116 L.Ed.2d 749 (1991). Plaintiff has failed to demonstrate that there is a material issue of fact as to either branch of this test.

"[W]hen a public employee speaks not only as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). The pertinent question is whether the speech at issue is a matter of public concern, an inquiry to be determined in light of the content, form and context of a statement. *Ezekwo,* 940 F.2d at 781; *see Saulpaugh v. Monroe Community Hosp.,* 4 F.3d 134 (2d Cir.1993).

Plaintiff nowhere alleges that any of the speech for which she allegedly was retaliated against was of public concern. Nor may plaintiff take comfort in the fact that part of her claim is grounded on a previous lawsuit, as it is the content of the suit, not the mere fact that she brought a suit, that triggers First Amendment rights. *Rathjen v. Litchfield,* 878 F.2d 836, 842 (5th Cir.1989) ("law is no different where the act which allegedly gave rise to the retaliation claim is the filing of a grievance or a lawsuit."); *see Sussman v. New York City Health & Hospitals Corp.,* No. 94 Civ. 8461(DBS), 1997 WL 334964, at *9 (S.D.N.Y. June 16, 1997) (same); *McCarthy v. Board of Trustees of Jefferson Community College,* No. 89 Civ. 942(NPM), 1991 WL 40885, at *8 (N.D.N.Y.Mar.25, 1991) (same). Plaintiff therefore does not satisfy the first prong of the *Ezekwo* test.

Plaintiff has failed also to raise a genuine issue as to whether there was any connection between her speech and the discrimination she allegedly suffered. Each and every untoward action of which plaintiff complains in

this case allegedly was committed by a co-worker or immediate supervisor located at the particular housing projects at which plaintiff was employed, many of them years after her previous lawsuit. She has offered no evidence that any of the alleged wrong-doers in this case was involved, or even aware of, her prior case, much less that their actions were a product of an order by or encouragement of more senior Authority personnel based at other locations. Each time plaintiff brought her grievances to the attention of Authority headquarters. specifically the DEO, her complaints were investigated in a responsible manner. Thus, plaintiff has failed to raise a genuine issue of fact as to the existence of any retaliatory motive.

### Conclusion

For all of the foregoing reasons, defendant's motion for summary judgment dismissing the complaint is granted in all respects save that it is denied insofar as the plaintiff seeks to hold the Authority liable on a failure to train theory for alleged discrimination with respect to the November 1994 incident involving Velez and the May 1995 bathroom incident.

SO ORDERED.