DEBRA ANN LIVINGSTON, Circuit Judge,
dissenting:
Until today, Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny represented a safeguard against the miscarriage of justice. In this Circuit — at least until such time as today’s error is corrected — Brady now includes, with our imprimatur, the right to recompense for a denial of the opportunity to commit perjury more successfully.
I concur fully in Judge Jacobs’s powerful dissent, which explains how the majority effectively (but unjustifiably) inters Heck v. Humphrey, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), as it relates to convictions obtained after an earlier verdict is set aside for Brady error. I write separately to make the point that Poventud’s claim, apart from undermining the basic premises of Heck v. Humphrey, also simultaneously distorts Brady v. Maryland and its progeny beyond recognition. Disregarding the Supreme Court’s recognition that Brady claims “have ranked within the traditional core of habeas corpus and outside the province of § 1983,” Skinner v. Switzer, — U.S. -, 131 S.Ct. 1289, 1300, 179 L.Ed.2d 233 (2011), the majority ignores the single fact that Poventud’s guilty plea necessarily defeats his Brady claim on the merits by rendering implausible any contention that the undisclosed impeachment evidence is material. The undisclosed evidence (as Poventud’s guilty plea now establishes) could only have been used at trial to support a perjurious defense. Today’s startling conclusion — that in such circumstances, a defendant can nevertheless state a claim for recompense arising from Brady v. Maryland — spells serious trouble for future applications of Brady in this Circuit.
* ❖ *
The relevant facts are simple, albeit elided in the majority’s presentation. First, Poventud’s 2006 guilty plea admits Poventud’s presence and armed participation in a crime that left Younis Duopo deprived of his money and shot in the neck. Second, this plea, as the majority acknowledges, is wholly and diametrically “at odds with [the] alibi” Poventud presented at his 1998 *166 trial, Maj. Op., ante, at 134 — a trial in which Poventud took the stand and introduced witnesses falsely to attest that he was elsewhere on the date in question, playing video games. Third, Poventud’s § 1983 action, premised on Brady, presses but one complaint: that Poventud at his 1998 trial was deprived of impeachment evidence he could have used to support his alibi defense by suggesting Duopo was mistaken in identifying him as the robber. Finally, in permitting this § 1983 claim to proceed, the majority concludes that Poventud’s guilty plea — notwithstanding that this plea is fundamentally at odds with his alibi defense — poses no obstacle to his Brady claim.
This is, indeed, a startling result. A “counseled plea of guilty is an admission of factual guilt so reliable,” the Supreme Court has said, “that, where voluntary and intelligent, it quite validly removes the issue of factual guilt from the case.” Menna v. New York, 423 U.S. 61, 62 n. 2, 96 S.Ct. 241, 46 L.Ed.2d 195 (1975) (per curiam) (emphasis in original). The Supreme Court’s Brady jurisprudence makes clear, moreover, that constitutional error for Brady purposes is only present when, considering the undisclosed evidence in light of the record as a whole, there is reasonable doubt.[1] Thus, the Supreme Court said in United States v. Agurs, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), that, “if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed.” But if this is not the case— “[i]f there is not reasonable doubt about guilt whether or not the additional evidence is considered,” id. at 112-13, 96 S.Ct. 2392 — no constitutional error has occurred. The majority determines, contrary to this authority, that Poventud can make out a Brady claim arising from the failure to provide him with impeachment evidence at his 1998 trial even though this undisclosed evidence (as Poventud’s guilty plea now establishes) could only have been used to support a perjurious defense. The lack of significant authority in favor of such a surprising result is an indication (and should have been a caution) that something in the majority’s analysis is amiss.
That something is a basic fidelity to Brady. The majority charges that it is the district court that “misunderstands Brady ” by “incorrectly presuming] that, on the facts of this case, the State could violate Poventud’s Brady rights only if Poventud is an innocent man.” Maj. Op., ante, at 134. To be sure, Brady can work in favor of the guilty, as well as those wrongly accused, but it is the majority (and not the district court) that misapplies the Brady rule. Fashioned as a safeguard against the miscarriage of justice, see United States v. Bagley, 473 U.S. 667, 675, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), *167 Brady imposes a fundamental obligation on the prosecution to disclose evidence for use at trial that is “favorable to [the] accused” and “material either to guilt or to punishment,” Brady, 373 U.S. at 87, 83 S.Ct. 1194. Where nondisclosure of such evidence occurs, regardless whether the undisclosed evidence was intentionally or negligently withheld (or, indeed, withheld in the absence of any fault on the part of the prosecution team), there is constitutional error: as the Supreme Court has said, such error occurs “because of the character of the evidence, not the character of the prosecutor.” Agurs, 427 U.S. at 110, 96 S.Ct. 2392. The constitutional concern is thus with a guilty verdict at trial in a circumstance in which the nondisclosure of favorable, material evidence “undermines confidence in the outcome,” Bagley, 473 U.S. at 678, 105 S.Ct. 3375, raising the concern of a possible miscarriage of justice, see United States v. Coppa, 267 F.3d 132, 139 (2d Cir.2001) (noting that the “essential purpose” of Brady and its progeny “is to protect a defendant’s right to a fair trial by ensuring the reliability of any criminal verdict against him”).
The majority thus errs, and badly so, in addressing the question whether Poventud may proceed with his § 1983 Brady claim without regard to an essential element that Poventud must prove at his civil trial: namely, the materiality of the undisclosed evidence. For as the Supreme Court has repeatedly said, a Brady claim is not made out by showing “any breach of the broad obligation to disclose exculpatory evidence.” See Strickler v. Greene, 527 U.S. 263, 281, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); see also United States v. Ruiz, 536 U.S. 622, 628, 122 S.Ct. 2450, 153 L.Ed.2d 586 (2002) (noting that “the Constitution does not require the prosecutor to share all useful information with the defendant”). Brady error occurs only when favorable undisclosed evidence is material when considered in light of the record as a whole. For “[i]f there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial,” and there is no constitutional error. Agurs, 427 U.S. at 112-13, 96 S.Ct. 2392; see also Bagley, 473 U.S. at 678, 105 S.Ct. 3375 (noting that “a constitutional error occurs ... only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial”).
At least until now, the character of the Brady right, focused as it is on the central question of whether the nondisclosure of favorable, material evidence saps confidence in the ultimate determination of guilt at trial, has placed most Brady claims “within the traditional core of habeas corpus and outside the province of § 1983.” Skinner, 131 S.Ct. at 1300.[2] The majority’s analysis, however, suggests that § 1983 will hereinafter be available to any defendant whose initial conviction is vacated for Brady error but who awaits retrial; or pleads guilty after vacatur; or is even convicted of the very same crime upon retrial. For in none of these cases, as the *168 majority puts it, would “a favorable judgment in [the] § 1983 action ... render invalid” any subsequent state court judgment. Maj. Op., ante, at 136-37. And favorable termination, in the majority’s view, is a hoary old requirement associated with malicious prosecution and not Brady claims, despite the fact that Heck itself involved a Brady claim. See Heck, 512 U.S. at 479, 114 S.Ct. 2364 (stating that Heck’s pro se complaint alleged, inter alia, that the defendants had “knowingly destroyed evidence which was exculpatory in nature and could have proved [Heck’s] innocence” (internal quotation marks omitted)).
The Supreme Court has held that “impeachment information is special in relation to the fairness of a trial,” so that “the Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant.” Ruiz, 536 U.S. at 629, 633, 122 S.Ct. 2450 (emphasis in original). But the Court has not yet considered a case like this one — where a § 1983 plaintiff seeks Brady damages after being convicted at trial, having his conviction vacated for the nondisclosure of impeachment evidence, and then pleading guilty, now solemnly admitting to the very proposition that the undisclosed trial evidence could have been used to impeach. It has long been understood, however, that “the scope of the government’s constitutional duty” pursuant to Brady — “and, concomitantly, the scope of a defendant’s constitutional right — is ultimately defined retrospectively.” Coppa, 267 F.3d at 140. And this is enough to doom Poventud’s § 1983 claim.
Poventud’s guilty plea, establishing (as it does) that the undisclosed impeachment evidence about which Poventud complains could only have been used by him at trial to impeach Duopo’s accurate identification of Poventud as his assailant, forecloses the possibility that Poventud’s Brady claim can succeed. This is not to excuse the conduct of police in failing to provide Poventud with the information at trial that Duopo, from his hospital bed, first identified Poventud’s brother as the assailant, before Poventud was a suspect at all.[3] Poventud’s trial conviction was vacated on this ground, and properly so. But Poventud has now solemnly admitted that he committed the crime that on March 6, 1997, at about 8:40 in the evening, left Younis Duopo in the area of Oliver Place and Marion Avenue in the Bronx, bleeding from a gunshot wound. Poventud’s guilty plea establishes, as a matter of law, that he was the armed assailant and that Duopo was not mistaken in identifying him — in short, that the undisclosed impeachment evidence is utterly immaterial. Thus, even if Poventud’s § 1983 claim were not barred by Heck — and it is — it should have been dismissed on the pleadings. For Poventud, having admitted in his guilty plea to the truth of what the undisclosed evidence could only have helped him falsely deny, cannot possibly allege the elements of a cognizable Brady claim under any pleading standard. See Fed.R.Civ.P. 12(b)(6); see also Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (stating that a complaint should be dismissed if “it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief”), abrogated by Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d *169 929 (2007) (rejecting Conley in favor of the plausibility standard).
The majority avoids this conclusion by reading materiality out of a Brady claim— by suggesting, inexplicably, that whenever favorable evidence goes undisclosed, and the defendant is convicted at trial, the State has ipso facto failed to prove guilt beyond a reasonable doubt and a Brady violation has been established.[4] The elements of a Brady claim, however, are well settled and require both the nondisclosure of favorable evidence and a showing that the undisclosed evidence is material — that the undisclosed evidence creates a reasonable doubt as to guilt or punishment, considering the record as a whole. See, e.g., Alexander v. McKinney, 692 F.3d 553, 556 (7th Cir.2012) (“In order to bring a Brady claim [under § 1983], a plaintiff must demonstrate that: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) the evidence was material, that is, there was a reasonable probability that prejudice ensued.”); accord Smith v. Almada, 640 F.3d 931, 939 (9th Cir.2011); Ambrose v. City of New York, 623 F.Supp.2d 454, 467 (S.D.N.Y.2009). Poventud, having admitted in his guilty plea that he was present and that he participated in the crime, cannot at his § 1983 trial contend that the undisclosed impeachment evidence raises a question as to these very propositions. In short, he cannot establish materiality as a matter of law.
Judge Lynch, in his concurrence, similarly disregards the element of Brady materiality, asserting that Brady damages should be awarded to Poventud “for the fact that Poventud lost the opportunity to be acquitted of a crime that he may very well have committed because the rules were not followed” at the trial that preceded his guilty plea. Concurring Op. of Judge Lynch, ante, at 143. Poventud’s plea, he argues, should not preclude such damages because “humankind lacks the capacity to obtain absolute knowledge of the truth about past events.” Id. at 143. The truth, he notes (in an observation perhaps made once or twice before), “is elusive, and can never be known with certainty.” Id. at 145. Judge Lynch charges that the dissenters, apparently forgetting “the limited scope of human knowledge,” “appear to insist that [Poventud’s] guilty plea represents not just a legal truth, but an existential one.” Id. at 143,145.
With respect, it is the majority that refuses to give Poventud’s guilty plea its ordinary, legal effect. Perhaps because cognizant of the limits of human knowledge, the Supreme Court has cautioned that a guilty plea “is a grave and solemn act to be accepted only with care and discernment.” Brady v. United States, 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). “Central to the plea,” the Court has said, “and the foundation for entering judgment against the defendant is the defendant’s admission in open court that he committed the [charged] acts.... He thus stands as a witness against himself.” Id.; see also Tollett v. Henderson, 411 U.S. 258, 267, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973) (noting that a criminal *170 defendant who has solemnly admitted his guilt in open court “may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea”).
Judge Lynch argues that Poventud’s guilty plea is no more reliable than his alibi testimony at trial. But he cites no authority (and there is none) for the proposition that judges may pick and choose which guilty pleas should be afforded their ordinary legal effect.[5] As a legal matter, moreover (and without any need to claim omniscience), only one of Poventud’s conflicting accounts of where he was and what he was doing on the night of March 6, 1997, is part of an outstanding criminal judgment that is binding upon him in other proceedings — including for purposes of collateral estoppel in a civil suit such as this. See Allen v. McCurry, 449 U.S. 90, 102-04, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980) (holding that collateral estoppel precludes a § 1983 plaintiff from relitigating facts established in a prior criminal conviction).
In the circumstances of this case, in which Poventud’s guilty plea affirms the truth of what the impeachment evidence could only have helped him deny at trial, Poventud’s plea renders him unable to prove materiality at his § 1983 trial. Because a counseled guilty plea, where voluntary and intelligent, “removes the issue of factual guilt from the case,” Menna, 423 U.S. at 62 n. 2, 96 S.Ct. 241, the omitted evidence no longer creates a reasonable doubt that did not otherwise exist. See Agurs, 427 U.S. at 112-13, 96 S.Ct. 2392 (noting that omitted evidence “must be evaluated in the context of the entire record” and observing that where such evidence raises no reasonable doubt, constitutional error has not occurred). Poventud cannot establish materiality as a matter of law. And the majority avoids this conclusion only by dispensing with this element of a Brady claim.
Judge Lynch argues that “simple justice” requires the “common sense, rough justice” result the majority reaches here. Concurring Op. of Judge Lynch, ante, at 168-69, 169. . Poventud obtained his rough justice, however, when the state court, on a record that did not include Poventud’s subsequent admission to participation in the crime, properly determined that the nondisclosure of Duopo’s initial misidentification of Poventud’s brother required vacatur of Poventud’s trial conviction and remand for a new trial. Poventud’s indeterminate sentence of 10 to 20 years was set aside. Poventud, however, has now solemnly admitted that he was the robber — that Duopo’s trial identification was accurate and, in effect, that Poventud’s alibi defense was perjurious. It is neither “common sense” nor “justice” to conclude that a counseled defendant who negotiates a guilty plea after the vacatur of a trial conviction for Brady error, admitting the truth of what the undisclosed evidence could only have been used at trial to deny, may thereafter impugn that negotiated plea in a § 1983 suit in which he stridently asserts both his innocence and his right to substantial compensation. By refusing to afford Poventud’s plea its ordinary legal effect, the majority, contrary to Brady and its progeny, adopts “a constitutional standard of materiality [that] approaches the ‘sporting theory of justice’ which the Court expressly rejected in Brady.” Agurs, 427 U.S. at 108, 96 S.Ct. 2392.
*171 The majority charges that the dissenters “misunderstand” Lockhart v. Fretwell, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). Maj. Op., ante, at 134-35 n. 16. In fact, it is the majority that refuses to take the wise counsel of that case, which makes apparent that materiality must be assessed retrospectively — and here, requires taking Poventud’s guilty plea into account. Fret-well involved an ineffective assistance claim. As Judge Jacobs points out, the prejudice component of such claims, as first articulated in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), requires courts, in determining whether a defense lawyer’s conduct has deprived a defendant of his Sixth Amendment rights, to undertake a retrospective inquiry — as with Brady — into whether an asserted error has produced an unreliable result at trial. In Fretwell, the Supreme Court declined to find constitutional error in trial counsel’s failure to raise an objection that, as Justice O’Con-nor said in her concurrence, “very well may have been sustained had it been raised at trial” but which, by the time the Court took up the question, was “wholly meritless under current governing law.” Fretwell, 506 U.S. at 374, 113 S.Ct. 838. The Court determined that it was not appropriate to assess the effectiveness of counsel “under the laws existing at the time of trial” because such an approach would “grant the defendant a windfall to which the law does not entitle him” and be inconsistent with the focus of Strickland’s prejudice component on the reliability and fairness of the ultimate result. Id. at 369-71, 113 S.Ct. 838 (majority opinion).
Similarly here, Poventud’s guilty plea, attesting to the accuracy of Duopo’s identification of Poventud as his assailant, forecloses Poventud’s Brady-based § 1983 claim by establishing the immateriality of the undisclosed evidence as a matter of law. Vacatur of Poventud’s trial conviction was required because, prior to Poventud’s plea, the nondisclosure of the impeachment material created a reasonable doubt as to the accuracy of Duopo’s identification. See Agurs, 427 U.S. at 112, 96 S.Ct. 2392 (“[I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed.”). Poventud’s subsequent guilty plea, however, establishes the immateriality of the nondisclosure categorically. And contrary to the majority’s position, there is no constitutional error from the nondisclosure of immaterial evidence — evidence that does nothing more than increase a defendant’s odds at trial, irrespective of “our overriding concern with the justice of the finding of guilt.” Id. For, once again, “[t]hat statement of a constitutional standard of materiality approaches the ‘sporting theory of justice’ which the Court expressly rejected in Brady.” Id. at 108, 96 S.Ct. 2392.
As Judge Jacobs’s principal dissent makes clear, this case is easily resolved with a faithful application of Heck. For while the majority assures us that Heck does not apply because “a favorable judgment in this § 1983 action would not render invalid” Poventud’s “plea-based judgment,” Maj. Op., ante, at 136, this is wholly beside the point. Heck does not bar § 1983 actions that invalidate state convictions, but those where success in a plaintiffs damages suit would necessarily impugn his extant state conviction, implying its invalidity. See Wallace v. Kato, 549 U.S. 384, 393, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007) (noting that the Heck bar applies where § 1983 claim would necessarily “impugn” an extant conviction). Poventud cannot prove the elements of his § 1983 claim — cannot prove, in Judge Lynch’s words, that the failure to provide Poventud with the omitted impeachment material *172 corrupted the trial’s fact-finding process— without establishing that the nondisclosed impeachment evidence is material. To do this, Poventud must establish that considering the record as a whole, the omitted impeachment material creates a reasonable doubt as to whether he was Duopo’s assailant. See Agurs, 427 U.S. at 112, 96 S.Ct. 2392 (noting that materiality has been established “if the omitted evidence creates a reasonable doubt that did not otherwise exist,” considering the record as a whole). In other words, he must draw into question — impugn—the veracity of his own plea. In such circumstances, the Heck bar clearly applies.
Even if this were not the case, however (and it certainly is), Poventud’s Brady claim still fails on the merits. Judge Lynch says that “[n]o one who was not there will ever know for certain whether Marcos Poventud participated in the robbery of Younis Duopo.” Concurring Op. of Judge Lynch, ante, at 143. But affording Poventud’s guilty plea its ordinary legal effect requires no such certitude (existential or otherwise), but only that we take Poventud himself at his solemn word. Poventud has stated, in entering a guilty plea, that he committed the crime. He could have continued to deny it and, if successful in his state court proceeding, thereafter sued for damages pursuant to § 1983. Having chosen to plead guilty, however, Poventud has also pled himself out of his Brady-based § 1983 claim by establishing the utter immateriality of the impeachment evidence that was not produced at trial. In holding otherwise — in permitting Poventud to have it both ways — the majority adopts a “sporting chance” approach to Brady materiality that the Supreme Court has expressly rejected. See Brady, 373 U.S. at 90, 83 S.Ct. 1194 (rejecting such an approach as beneath “the dignity of a constitutional right”).
As the majority acknowledges, this Court convened en banc to decide a different issue from the one it reaches today. With regret, I concur in Judge Jacobs’s forecast that the majority’s effort here with respect to the issue we do decide will prove nearly impossible for district courts faithfully to apply. Our Heck jurisprudence will suffer. So will our efforts to identify — and rectify — Brady error.
Until today, Brady and its progeny represented a safeguard, however imperfect, against the miscarriage of justice. See Bagley, 473 U.S. at 675, 105 S.Ct. 3375 (noting that Brady’& purpose is “to ensure that a miscarriage of justice does not occur”); accord Agurs, 427 U.S. at 112, 96 S.Ct. 2392 (observing that materiality standard “must reflect our overriding concern with the justice of the finding of guilt”). In this Circuit — at least until such time as today’s error is corrected — Brady is instead the right to recompense for being denied the opportunity to commit perjury more successfully.
APPENDIX
UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK
MARCOS POVENTUD, Plaintiff,
-against-
CITY OF NEW YORK; DANIEL TOO-HEY, “FRANKIE” ROSADO, CHRISTOPHER DOLAN, and KENNETH UMLAUFT, Individually and as Members of the New York City Police Department, Defendants.

SECOND AMENDED COPMPLAINT

Index No. 07 Civ. 339(DAB)(THK)
Plaintiff MARCOS POVENTUD (“Plaintiff’), by his attorneys, ROMANO & *173 KUAN, PLLC, and the LAW OFFICES OF JOEL B. RUDIN, complaining of the Defendants, respectfully alleges, upon information and belief, as follows:

NATURE OF ACTION

1. This is a civil action, pursuant to 42 U.S.C. § 1983 and Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (“Brady ”), seeking monetary damages for Plaintiffs wrongful attempted murder and robbery conviction, and imprisonment for approximately seven years, during which he was repeatedly assaulted sexually and physically, and traumatized.
2. The above-named Individual Defendants, all New York City police detectives, caused Plaintiffs unconstitutional conviction and subsequent imprisonment by deliberately suppressing exculpatory evidence, known as “Brady material,” and also lying to and misleading prosecutors. The suppressed Brady material consisted of an erroneous identification by the victim of the crime, who was the prosecution’s sole identification witness, of a man who was in prison when the crime was committed. The deliberate police cover-up of such evidence, as well as the lies police detectives told the prosecutors when denying that any undisclosed identification had occurred, was a substantial and proximate cause of Plaintiffs conviction and his horrible experiences in prison which followed. The City of New York is liable, pursuant to Monell v. Neiu York City Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), for the deliberate indifference of policymaking officials at the New York City Police Department (“NYPD”) to such constitutional violations, which was a substantial cause of the wrongdoing that occurred.

STATEMENT OF JURISDICTION

3. At all times herein mentioned, Plaintiff was a resident of the County of Bronx, City and State of New York.
4. Defendant CITY OF NEW YORK (“Defendant CITY”) is a municipal corporation existing by virtue of the laws of the State of New York.
5. The NYPD is an agency of the Defendant CITY, and all police officers and detectives referred to herein were at all times relevant to this complaint its employees and agents.
6. Defendant DANIEL TOOHEY (“Defendant TOOHEY”), Tax I.D. No. 888030, was at all relevant times a detective employed by the NYPD. He is named here in his official and individual capacities.
7. Defendant “FRANKIE” ROSADO (“Defendant ROSADO”), Tax I.D. No. 892012, was at all relevant times a detective employed by the New York City Police Department. He is named here in his official and individual capacities.
8. Defendant CHRISTOPHER DO-LAN (“Defendant DOLAN”), Tax I.D. No. 891468, was at all relevant times a detective employed by the New York City Police Department. He is named here in his official and individual capacities.
9. Defendant KENNETH UMLAUFT (“Defendant UMLAUFT”), Tax I.D. No. 881484, was at all relevant times a detective employed by the New York City Police Department. He is named here in his official and individual capacities.
10. At all times material to this Complaint, the aforementioned individual Defendants acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State and City of New York.

*174
ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

The Investigation of the Shooting of Younis Duopo

11. The victim in the underlying criminal case was a livery cab driver named Younis Duopo. During a robbery attempt, he was shot in the head at approximately 8 p.m. on March 6, 1997, by two passengers who were in the back seat of his cab. Duopo was hospitalized but survived.
12. Duopo’s livery cab was vouchered by trained NYPD Crime Scene Unit (“CSU”) detectives.
13. It was the job of these detectives to search the taxicab for and to secure all physical evidence possibly related to the crime.
14. They found 16 fingerprints, but none were Plaintiffs. They found a hat and a spent shell, but this evidence also was not linked to Plaintiff.
15. After the CSU finished its work, Defendant ROSADO claimed that he found a blue canvas wallet on the floor of the front passenger seat of Duopo’s livery cab.
16. This area had been searched and photographed by the CSU detectives, who did not find any such wallet.
17. The wallet that Defendant ROSA-DO claimed to have found contained two old photo identification cards of a man named Francisco Poventud, and nothing else.
18. Defendant UMLAUFT, a sergeant who was in charge of all the detectives working on the investigation, on the evening of March 10, 1997, showed Francisco Poventud’s picture, taken from one of the identification cards, to Duopo.
19. Duopo identified Francisco Poventud as one of his assailants.
20. Duopo, in UMLAUFT’s presence and at his request, signed a photocopy of Francisco Poventud’s identification card.
21. This was consistent with NYPD procedure, under which a witness is asked to sign his name next to a photograph to indicate a positive identification.
22. Following this identification, Defendants TOOHEY, ROSADO, DOLAN and UMLAUFT (the “Individual Defendants”) learned that Francisco Poventud was incarcerated on the date of the shooting, and therefore could not have been one of the men involved.
23. The Individual Defendants, contrary to their training and to the official policy of the New York City Police Department, failed to prepare any report that would reveal or draw attention to the erroneous identification.
24. Having nowhere else to turn to “close” the case, the Individual Detectives decided to investigate Francisco Poventud’s family members, including Plaintiff, who is Francisco’s brother.
25. At the time of the crime, Plaintiff did not physically resemble his brother, nor did Plaintiff resemble Francisco as he was depicted in the old photograph identified by Duopo.
26. Nevertheless, on March 12, 1997, the Individual Defendants went to the hospital and showed Duopo a photo array that included Plaintiffs photograph, and five “fillers.”
27. Duopo did not make any identification.
28. The next day, on March 13, 1997, the Individual Defendants returned to the hospital with the same photo array.
29. Duopo looked at the photos in the array and again did not make an identification.
*175 30. The Individual Defendants indicated in a report that this was a “negative result.”
31. The following day, on March 14, 1997, the Individual Defendants again returned to the hospital, this time with a new photo array. It again contained a photograph of Plaintiff, but five different fillers.
32. Thus, Plaintiff was the only individual depicted in more than one photo identification procedure — in fact, his photo was in all three.
33. After the third photo array procedure, Duopo, for the first time, identified Plaintiff as one of the perpetrators.
34. Following this identification, the Individual Defendants, under the direction of UMLAUFT, caused criminal charges to be filed against Plaintiff for the robbery and shooting of Duopo.
35. They also searched Plaintiff’s residence, but found no evidence linking him to the crime.
36. The police theory apparently was that Plaintiff had somehow dropped the wallet containing his brother’s identification cards onto the floor near the front passenger seat of the victim’s taxicab, even though the robbery was committed from the back seat and the perpetrators had no reason to display the wallet at all, and despite the absence of any evidence that Plaintiff would carry his brother’s wallet or identification cards.
37. Police found no fingerprints or DNA evidence on the wallet or the cards to link Plaintiff to these items.
38. The police also had no evidence that the wallet had been dropped during the robbery, as opposed to at some other time.
39. Following his arrest, Plaintiff voluntarily waived his Miranda rights and made a videotaped statement to police.
40. He said, in substance, that he had been playing video games at a neighbor’s apartment at the time of the crime, and provided the names of alibi witnesses.
41. Upon information and belief, the Individual Defendants did not investigate this alibi, but simply proceeded with processing Plaintiff’s arrest.
42. On or about March 23, 1997, 17 days after the Duopo shooting, police apprehended three men for a gunpoint robbery of a livery cab driver committed in a similar manner as the Duopo robbery in the same general vicinity in the Bronx.
43. Ballistics tests with the gun used in that robbery conclusively established that it was the same weapon that had been used to shoot Duopo.
44. Jesus Martinez, the gunman in the second robbery, when compared with the appearance of the other two men arrested with him, most closely resembled the description of the shooter provided by Duopo.
45. Rather than take the risk that Duopo would identify Martinez and undercut their case against Plaintiff, police did not show Martinez to Duopo in a photo array or a lineup.
46. Instead, on April 2, 1997, police showed Duopo, who knew that an arrest had been made after his photo identification of Plaintiff, a lineup containing Plaintiff. Unsurprisingly, Duopo identified Plaintiff.
47. The Individual Defendants knew that Duopo’s misidentification of Francisco Poventud was highly relevant to the Bronx District Attorney’s evaluation of the strength of the evidence against Plaintiff, to the grand jury’s decision whether to *176 indict, to the court’s decision whether to grant reasonable bail, to the court’s decision whether to permit Duopo to make an in-court identification, and to the ultimate decision of the jury at trial whether to convict Plaintiff.
48. The Individual Defendants knew that they were required by the policies, practices, and procedures of the NYPD, and of the Bronx District Attorney’s Office [“BDAO”], to disclose all out-of-court identification procedures to prosecutors handling the criminal prosecution, so that such procedures could be timely disclosed to the defense.
49. They were required to make such disclosure to the D.A.’s Office at the time of the initiation of the prosecution, at the time of the presentation of evidence to the grand jury, and/or prior to trial.
50. Nevertheless, the Individual Defendants did not inform the BDAO of the Francisco Poventud misidentification, before, during, or after Plaintiffs trial. Indeed, when asked by the BDAO to disclose all out-of-court identification procedures utilized during their investigation of this matter, the Individual Defendants essentially lied by disclosing all but the Francisco Poventud identification procedures.
51. Weeks after Plaintiffs arrest, again utilizing highly suggestive photo and in-person identification procedures, police caused Duopo to identify Robert Maldonado, who had no relationship with Plaintiff, as the second perpetrator. Maldonado was arrested.
52. As a result of the police cover-up of the Francisco Poventud misidentification, the grand jury was deprived of essential information with which to evaluate Duopo’s reliability as an identification witness, and Plaintiff and Maldonado were indicted.
53. As a further result of the police cover-up of the Francisco Poventud misidentification, the court was misled concerning the strength of the case against Plaintiff and set prohibitively high bail of $100,000, causing Plaintiff to be incarcerated until trial.

The Trial Proceedings

54. Following Plaintiffs indictment, Plaintiffs counsel made a specific request of the prosecution to disclose whether any witness had “identified anyone other than defendant or codefendant as perpetrators of the crimes charged,” and to disclose “all evidence and information ... which may tend to exculpate defendant either by an indication of his innocence, or by potential impeachment of a witness to be called by the District Attorney within the meaning of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and People v. Rosario, 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881 (1961).”
55. Under the Brady disclosure rule, the prosecution has a continuing obligation to disclose material information favoring the criminal defendant in the possession, custody or control of the District Attorney’s Office or the police, especially where the defendant specifically demands such disclosure.
56. In a specific-demand case, the prosecutor’s failure to disclose is likely to mislead the defense into assuming that such evidence does not exist, and thus the prosecution’s disclosure obligation is heightened.
57. In addition, under the related Rosario rule, the prosecution has an obligation to disclose to the defense all prior recorded statements of each of its trial witnesses, so that counsel for the accused may determine whether such statements may be used to cast doubt on the witness’s testimony.
*177 58. Duopo’s handwritten notation on a copy of Francisco Poventud’s photograph mistakenly identifying him was a “statement” that had to be disclosed under Rosario as well as under Brady.
59. However, as a result of the police cover-up of the Francisco Poventud misidentification, the BDAO did not know about, and did not disclose to the defense, Duopo’s “statement” misidentifying Francisco Poventud.
60. This was so even though the Individual Defendants knew the court was holding a pretrial hearing, at which several of them testified, concerning the lawfulness of the identification procedures used with Duopo and whether Duopo’s in-court and out-of-court identifications of Plaintiff and Maldonado were sufficiently reliable to be permitted in evidence.
61. The Individual Defendants knew that Duopo’s misidentification of Francisco Poventud would be highly relevant to the court’s determination of such hearing.
62. Indeed, at the hearing, the court expressed concern that the repeated showing of Marcos Poventud’s photograph to Duopo during the three photo identification procedures was unfairly suggestive and raised questions about Duopo’s ability to make a reliable, in-court identification.
63. Even though the court then required the prosecution to present Duopo as a witness to establish his independent ability to make a reliable, in-court identification, the police continued to suppress the Francisco Poventud identification evidence, causing the prosecution to fail to disclose it.
64. As a result, the court ruled that Duopo would be allowed to make an in-court identification of Plaintiff.
65. The prosecutor at the hearing and the trial was Assistant District Attorney [“ADA”] Gregg Turkin.
66. Prior to and during trial, the Individual Defendants reviewed the evidence, including the police investigation, with ADA Turkin, but still did not reveal to him the Francisco Poventud photo identification procedure and misidentification.
67. Indeed, they deliberately misled ADA Turkin into believing that, since Francisco Poventud was incarcerated when the crime was committed, they had no reason to, and in fact did not, conduct any identification procedure containing his photograph.
68. During the trial, the prosecution did not disclose to Plaintiff or to any defense counsel the Francisco Poventud photo identification procedure, Duopo’s identification of Francisco’s photo, or the existence of anything written by Duopo concerning such an identification procedure.
69. The evidence “against” Plaintiff at trial was extremely limited: it consisted solely of Duopo’s testimony identifying him, as well as the alleged discovery of his brother’s wallet and old identification cards in the front passenger area of the livery taxi.
70. No physical evidence linked Plaintiff to the crime.
71. There was substantial evidence undermining the reliability of Duopo’s identification testimony. First, the jury learned that Duopo had failed to identify Plaintiff during the first two photo arrays containing his likeness.
72. Second, right in front of the jury, Duopo misidentified co-defendant Robert Maldonado’s brother as one of his assailants.
*178 73. Meanwhile, Duopo’s testimony-identifying Plaintiff was contradicted by the defense case. Plaintiff testified in his own behalf that at the time of the crime he was at a neighbor’s apartment playing video games and watching movies.
74. Several defense witnesses also gave testimony supporting this alibi.
75. In addition, the defense presented evidence that the weapon used to shoot Duopo had been recovered in the possession of three other men, during a similar robbery attempt, just 17 days after the Duopo robbery.
76. The purported “reliability” of Duopo’s identification of Plaintiff, as well as the professionalism of the police investigators who had obtained Duopo’s identifications of the defendants, were the key issues addressed by both sides during their closing arguments to the jury.
77. Even without knowledge of the Francisco Poventud misidentification evidence, or of the Individual Defendants’ cover-up of it, the jury initially said it was deadlocked.
78. On the morning of the third day of deliberations, the jury requested a “read back” of the detectives’ and the complainant’s testimony regarding the “negative results” from the March 13, 1997, photo array involving Plaintiffs photo.
79. That evening, the jurors stated they were “hopelessly deadlocked” with regard to both defendants.
80. Nevertheless, after the court required them to continue deliberating for two more days, the jury returned a verdict of guilty against both defendants.
81. The prosecution’s failure to disclose Duopo’s misidentification of Francisco Poventud, as well as the police cover-up and lies concerning this evidence, was a substantial and proximate cause of Plaintiffs conviction.
82. On June 30, 1998, the court sentenced Plaintiff to serve an indeterminate sentence of 10 to 20 years in prison.
83. At the time of Plaintiffs conviction, he was 26 years old, had never been in prison before, and was of slight build.
84. The Individual Defendants knew of these characteristics of Plaintiff.
85. They also knew that individuals with Plaintiffs characteristics were likely to be physically and sexually assaulted in New York City jails and in New York State maximum security prisons.
86. While Plaintiff appealed his conviction, the Individual Defendants continued to withhold knowledge from the BDAO, and therefore from the defense, of Duopo’s misidentification of Francisco Poventud.
87. Plaintiffs appeal was denied. See People v. Poventud, 300 A.D.2d 223, 752 N.Y.S.2d 654 (1st Dep’t 2002), leave to appeal denied, 1 N.Y.3d 578, 775 N.Y.S.2d 794, 807 N.E.2d 907 (2003).

The Discovery of the Brady Violation and Vacatur of Plaintiff’s Conviction

88. On April 25, 2002, the New York Court of Appeals reversed co-defendant Robert Maldonado’s conviction, and directed that Maldonado be retried. See People v. Maldonado, 97 N.Y.2d 522, 743 N.Y.S.2d 389, 769 N.E.2d 1281 (2002).
89. At the retrial held in late 2003, Duopo’s ability to make a reliable identification was again the principal issue.
90. By the time of this retrial, either the NYPD or the BDAO had somehow lost or destroyed the original Francisco Poventud identification cards.
91. A new prosecutor was assigned to the case, Assistant D.A. Jeremy Shockett.
*179 92. He offered as a substitute for the original cards a photocopy of one of them.
93. The photocopy contained illegible handwriting, and a date and time— “3/10/97 at 1943 hrs.”
94. Contending that the handwriting was irrelevant to the case, Shockett made an application to the court for permission to redact the writing from the photocopy.
95. The defense objected, and the court denied the request.
96. Maldonado’s attorney demanded to know the significance of the handwriting.
97. After speaking with UMLAUFT and learning for the first time what the handwriting meant, Shockett then revealed to the defense that the handwriting was Duopo’s and concerned a mistaken identification of Francisco Poventud.
98. UMLAUFT, during his testimony, tried to minimize the impact of this evidence by falsely claiming that Duopo, from his hospital bed, had simultaneously written a note stating that the photograph merely “looked like the guy.”
99. However, even though UMLAUFT knew that any such note, as a recorded statement by Duopo, absolutely was required to be preserved and to be disclosed to the defense as Rosario material, he could not produce it.
100. No one, aside from UMLAUFT, has ever claimed to have seen such a note.
101. This time, the jury acquitted Maldonado.
102. On March 25, 2004, Plaintiff, who was indigent, requested, and the court thereafter agreed, to assign counsel for him to prepare and file a motion, pursuant to N.Y. Criminal Procedure Law § 440.10, to vacate his conviction on the ground that the prosecution had impermissibly failed to disclose to him the Francisco Poventud identification and any writings regarding it (hereinafter referred to as the “Brady material”) at his trial six years before.
103. On December 6, 2004, Plaintiffs assigned counsel filed a CPL § 440.10 motion to vacate his conviction. The motion asserted that, at the time of Plaintiffs trial in 1998, Plaintiff and his attorney were not told, and did not know, about the Brady material, even though the defense had specifically requested disclosure of just this type of evidence.
104. Before responding to this motion, ADA Shockett interviewed UMLAUFT.
105. UMLAUFT lied to Shockett. UMLAUFT claimed that he had told then ADA Turkin, during Plaintiffs trial in 1998, about the Brady material.
106. UMLAUFT further lied by stating that, at Turkin’s direction, he had disclosed the Francisco Poventud identification procedure to defense lawyers during an informal hallway conversation.
107. As a result of UMLAUFT’s lies, Shockett and the BDAO decided to oppose Plaintiffs motion. They submitted court papers, including UMLAUFT’s false affidavit, denying any withholding of evidence under Brady and delaying any court decision until after a hearing.
108. At an evidentiary hearing held on June 15, 2005, UMLAUFT gave false testimony repeating what he had told ADA Shockett. See ¶¶ 105-106, supra.
109. The defense lawyers for Plaintiff and co-defendant Robert Maldonado denied under oath that UMLAUFT had made any disclosure to them of the Brady material.
110. The BDAO did not call Turkin to testify at all.
111. In a decision dated October 6, 2005, the court (Hunter, J.S.C.) credited the defense attorneys over UMLAUFT *180 and held that the prosecutor’s failure to turn over information and written documents regarding Duopo’s misidentification of Francisco Poventud had violated Plaintiffs constitutional rights under Brady.
112. The court vacated Plaintiffs conviction. See People v. Poventud, 10 Misc.3d 337, 802 N.Y.S.2d 605 (Sup.Ct. Bronx Co.2005), annexed hereto as Exhibit A.
113. At the time of its ruling, Plaintiff had been incarcerated more than seven years following, and as a direct result of, his unconstitutionally-obtained conviction.

Plaintiff’s Injuries and Damages

114. As a direct, proximate, and reasonably foreseeable consequence of the aforementioned actions by the defendants, plaintiff:
(1) Was denied his state and federal constitutional rights and liberties;
(2) Was repeatedly subjected to forcible sexual assaults at knife-point and otherwise, including anal and oral sodomy, and physical beatings;
(3) Was further traumatized by witnessing sexual and physical assaults on other inmates;
(4) Was so distraught that he tried to kill himself;
(5) Suffered severe mental, emotional, and physical distress, including suicidal feelings;
(6) Suffered permanent mental and emotional harm;
(7) Was denied the opportunity to pursue normal relationships with and to enjoy the companionship of family members and Mends;
(8) Was publicly shamed, disgraced, ridiculed and humiliated and suffered damage to reputation;
(9)Suffered lost wages and permanent impairment of earning capacity; and
(10)Incurred other items of attendant damages.

FIRST CAUSE OF ACTION

(42 U.S.C. § 1983; Denial Of Due Process And A Fair Trial; All Individual Police Defendants)
115. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 114 as if fully set forth herein.
116. Prior to Plaintiffs conviction in 1998, and continuing thereafter, the Individual Defendants, acting individually and in concert and conspiracy with one another, covered up, lied to prosecutors about, and withheld knowledge from the BDAO and Plaintiff of, the “Brady material.”
117. The Individual Defendants knew they had duties, under the United States Constitution as well as the laws and regulations of the State and the City of New York, (a) to disclose the Brady material to the BDAO so that the latter could disclose it to the defense and would not be caused to bring about the conviction of Plaintiff based upon false, misleading, or incomplete evidence and argument, (b) under the unique circumstances of this case, to disclose the Brady material directly to the defense, and/or (c) to make truthful statements to the prosecution concerning the existence of the Brady material and not to cause or continue Plaintiffs unconstitutional conviction and -resultant injuries by lying about such evidence.
118. Notwithstanding their awareness of their duties, the Individual Defendants, prior to, during, and following Plaintiffs trial, intentionally, recklessly, and/or with deliberate indifference to their legal obligations, concealed the Brady material *181 from, lied about, and otherwise failed to disclose the Brady material to, the BDAO and Plaintiff.
119. They did so with the knowledge that their conduct would result in the jury being provided a false or misleading picture of Duopo’s reliability as an identification witness and of the thoroughness, honesty, and professionalism of the police investigation, and would thereby substantially increase the likelihood of a conviction, in violation of Plaintiffs federal constitutional rights.
120. After the Francisco Poventud misidentification evidence was revealed at the Maldonado retrial in 2003, Defendant UMLAUFT sought to cover up and perpetuate the defendants’ individual and collective wrongdoing, and caused the continuation of Plaintiffs illegal imprisonment and resultant damages, by falsely telling the BDAO, and submitting a false affidavit and giving false testimony, that he had disclosed such Brady material to defense counsel at Plaintiffs trial.
121. The aforesaid conduct operated to deprive Plaintiff of his rights under the Constitution and the Laws of the United States to timely disclosure of all material evidence favorable to the defense pursuant to Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and their progeny, and to not be convicted or punished based upon the government’s knowing use of false or misleading testimony or argument, all in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.
122. The foregoing violations of Plaintiffs federal constitutional rights by the Individual Defendants and their co-conspirators and accomplices, known and unknown, directly, substantially, proximately, and foreseeably brought about Plaintiffs conviction, his imprisonment until such time as his conviction was vacated, and his other injuries and damages.
123. The foregoing violations of Plaintiffs rights amounted to Constitutional torts and were affected by actions taken under color of State law.
124. Defendants committed the foregoing violations of Plaintiffs rights knowingly, intentionally, willfully, recklessly, negligently, and/or with deliberate indifference to Plaintiffs constitutional rights or to the effect of such misconduct upon Plaintiffs constitutional rights.
125. By reason of the foregoing, all the Individual Defendants are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages.

SECOND CAUSE OF ACTION

(Monell /42 U.S.C. § 1983: Claim Against Defendant City of New York For The Actions Of The NYPD)
126. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 125 as if fully set forth herein.
127. Prior to Plaintiffs arrest, policy-making officials at the NYPD, including but not limited to the New York City Police Commissioner, with deliberate indifference to the constitutional rights of individuals suspected of or charged with criminal activity, implemented or tolerated plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and/or discipline concerning the constitutional duty of police investigators to make timely disclosure to the District Attorney and/or the defense of Brady material, to provide truthful information to prosecutors about their knowledge of crim *182 inal investigations they have conducted, and to testify truthfully, accurately, and completely during criminal proceedings concerning such investigations.
128. The above-mentioned Brady material included, but was not limited to, evidence of innocence, evidence that an identifying witness was unreliable, and evidence impeaching the credibility of significant prosecution witnesses.
129. The aforesaid policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the Defendant City of New York, including but not limited to, the New York City Police Commissioner, who knew:
a) to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;
b) either that such issues present police employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult, or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of police employees mishandling such situations and by the incentives that police employees have to make the wrong choice in such situations; and
c) that the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants and cause them constitutional injury.
130.The aforementioned policymaking officials had notice of the need to properly instruct, train, supervise and/or discipline employees with regard to their aforementioned constitutional obligations based upon, among other circumstances:
a) numerous credible allegations, many substantiated by judicial decisions, that police officers had wrongfully withheld, lost, or destroyed evidence favorable to the defense that they had been required to timely disclose to the prosecution or the defense under Brady and Rosario (see Ex. B, appended hereto and incorporated herein by reference, listing some of those judicial decisions);
b) numerous civil lawsuits, some of which resulted in substantial civil settlements, alleging that police had falsified, exaggerated, or withheld evidence, thereby improperly causing unlawful injuries to individuals suspected of crimes (see Ex. C, appended hereto and incorporated herein by reference, listing some of those lawsuits);
c) numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals,, and the New York Appellate Division, discussing the difficult issues that regularly arise under the Brady rule;
d) judicial decisions directly criticizing the NYPD for failing to train and supervise officers in their Brady obligations and for failing to adopt adequate Brady disclosure policies, see Carter v. Harrison, 612 F.Supp. 749 (E.D.N.Y.1985) (McLaughlin, D.J., adopting the Report and Recommendation of then-Magistrate Shira A. Scheindlin), and putting the NYPD on notice that the City could be held *183 liable for its failure to adequately train police officers and investigators regarding their Brady and truth-telling obligations, see Walker v. City of New York, 974 F.2d 293 (2d Cir. 1992), and Carter v. Harrison, supra;
e) the report dated July 7, 1994, following highly-publicized hearings, of a blue-ribbon New York City investigation into police misconduct known as the “Mollen Commission,” and
f) the inherent obviousness of the need to train, supervise and discipline police officers in such obligations to counteract the pressure on officers to close cases and to obtain convictions and the powerful incentives they have to ignore, discard, fail to record, and fail to disclose evidence favoring a criminal suspect or defendant.
131. Under the principles of municipal liability for federal civil rights violations, the City’s Police Commissioner (or his authorized delegates), had (and has) final responsibility for training, instructing, supervising, and disciplining police personnel with respect to the investigation and prosecution of criminal matters, including constitutional requirements with respect to the disclosure of Brady material and the giving of truthful statements and testimony during criminal proceedings.
132. The Police Commissioner, personally and/or through his authorized delegates, at all relevant times had final authority, and constitutes a City policymaker for whom the City is liable, with respect to compliance by employees of the NYPD with the above-mentioned constitutional requirements.
133. During all times material to this Complaint, policymaking officials for the NYPD, including, the Police Commissioner, owed a duty to the public at large and to Plaintiff, which they knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs, practices, training, and/or discipline sufficient to deter and to prevent conduct by his subordinates which violates the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.
134. The aforesaid constitutionally inadequate policies, procedures, regulations, practices, customs, training, and/or discipline of or by Defendant City and the NYPD were collectively and individually a substantial factor in bringing about the aforesaid violations by the Individual Police Defendants of Plaintiffs rights under the Constitution and Laws of the United States.
135. By virtue of the foregoing, Defendant City of New York is liable for having substantially caused the foregoing violations of Plaintiffs constitutional rights and his constitutional injuries.

THIRD CAUSE OF ACTION

(Defendant City of New York for Negligent Hiring, Training, Supervision, And Discipline; Pendent Claim)
136. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 135, and hereby incorporates them as though fully set forth herein.
137. Plaintiff timely filed a Notice of Claim with the Comptroller of the City of New York on March 27, 2006.
138. Hearings pursuant to New York General Municipal Law § 50-h were waived by Defendant City of New York.
139. By virtue of the foregoing, Defendant City of New York is liable to Plaintiff for his injuries because its grossly negli *184 gent, careless, negligent, reckless and/or deliberate failure to properly hire, train, discipline, and/or supervise its agents, servants and/or employees employed by the NYPD, including the Individual Defendants, with regard to their aforementioned duties, was a reasonably foreseeable and proximate cause of the injuries suffered by Plaintiff.

JURY TRIAL DEMAND

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:
a. For compensatory damages in an amount to be determined;
b. For punitive damages against the Individual Defendants in an amount to be determined;
c. For reasonable attorneys’ fees, together with costs and disbursements, pursuant to 42 U.S.C. § 1988 and to the inherent powers of this Court;
d. For pre-judgment interest as allowed by law; and
e. For such other and further relief as this Court may deem just and proper.
ROMAN AND KUAN, PLLC
/s/Julia P. Kuan
BY: Julia P. Kuan, Esq (JK 3822)
100 Lafayette Street, Suite 401
New York, New York, 10013
(212) 274-0777
LAW OFFICES OF JOEL B. RUDIN
/s/ Joel B. Rudin
BY: Joel B. Rudin, Esq. (JR 5645)
200 West 57th Street, Suite 900
New York, New York 10019
(212) 752-7600

ATTORNEYS FOR THE PLAINTIFF

Dated: New York, New York
May 6, 2011
To: Corporation Counsel of the City of New York

. To be clear, the question in assessing Brady materiality is not whether it is more likely than not that a defendant would have been acquitted if the undisclosed evidence had been revealed (or whether, considering this evidence, the proof would have been sufficient). Rather, the question is whether, considering the record as a whole, the undisclosed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.” Strickler v. Greene, 527 U.S. 263, 290, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (internal quotation marks omitted); see also Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (citing United States v. Bagley, 473 U.S. 667, 678, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)) (defining a "reasonable probability” of a different result in terms of "a probability sufficient to undermine confidence in the outcome”). Such is not the case for information that might simply "affect the jury’s verdict,” without sapping confidence in the result. United States v. Agurs, 427 U.S. 97, 108, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

. The majority states, erroneously, that I argue "that Skinner v. Switzer, - U.S. -, 131 S.Ct. 1289, 1300, 179 L.Ed.2d 233 (2011), comprises a general prohibition on Brady-based § 1983 claims.” Maj. Op., ante, at 134 n. 14. I do not. Skinner simply recognizes, accurately, that because Brady evidence "is, by definition, always favorable to the defendant and material to his guilt or punishment,” and because parties asserting Brady violations "generally do seek a judgment qualifying them” for immediate or speedier release, 131 S.Ct. at 1300, Brady claims have most often sounded in habeas. My point is merely that the majority's reformulation of the Brady right — a reformulation that dispenses with Poventud’s obligation to prove materiality at his civil trial — changes this calculus for a not insignificant set of cases.

. As Judge Jacobs’s dissent accurately states, Poventud’s brother became a suspect when police recovered his photo identification from a wallet found in Duopo's cab. Suspicion focused on Poventud when police learned that his brother was in prison on the day of the crime.

. The majority also obliquely suggests, without explanation, that materiality might be shown here by virtue of the fact that Poventud pled guilty to a lesser included offense and not to the same charges on which he was convicted at trial. See Maj. Op., ante, at 135 n. 17. The majority is correct that the nondisclosure of favorable evidence material to punishment constitutes Brady error. See Brady, 373 U.S. at 87, 83 S.Ct. 1194. But here, the undisclosed impeachment evidence is not material to punishment: it goes solely to the question whether Duopo's identification of Poventud as one of the robbers was accurate — in short, to the question whether Poventud committed the crime at all.

. Ironically, Judge Lynch’s concurrence also makes apparent what the majority refuses to admit in its disavowal of the Heck v. Humphrey bar: namely, that Poventud’s effort to prove materiality at his § 1983 trial will, of necessity, involve the impugning of his extant conviction.